# THE FELDMAN LAW FIRM LLP

TWO POST OAK CENTRAL
1980 POST OAK BLVD., SUITE 1900
HOUSTON, TEXAS 77056-3877

TELEPHONE (713) 850-0700
www.feldlaw.com

TELECOPIER (713) 850-8530
TELECOPIER (713) 623-6636

October 22, 2015 (Revised November 10, 2015)

Scott K. Sullivan, M.D.
Frank J. DellaCroce, M.D.
c/o St. Charles Surgical Hospital
1717 St. Charles Avenue
New Orleans, LA 70130

*By email:* scottsullivanmd@gmail.com
*By email:* drd@brestcenter.com

### Re: *Joint Engagement Letter For Captive Formation/Administration*

Dear Dr. Sullivan and Dr. DellaCroce:

This is the joint engagement letter regarding the formation and operation of an alternative risk planning arrangement. This engagement proposes that the Firm and Capstone jointly serve as the "captain of the ship" with regards to your three cell arrangements, all as discussed below.

This letter supplements our agreement with each of the Firm and Capstone for administering your alternative risk planning program as such now exists and sets forth the roles and responsibilities of the various parties with respect to such. As well, various options (e.g., secured lending, the above discussed reorganization, etc.) are made available to you.

**SCOPE OF SERVICES.** Note that there are three basic types of property & casualty insurers, being formed and operated under Internal Revenue Code ("IRC") §501(c)(15), §831(b) or §831(a). In your case, the entities formed and operated under IRC §831(b) ("intermediate" captives), which has a practical annual premium limitation of $1,000,000± , are applicable to the Clinic given the scope of its business. See Exhibit D.

As explained, the purpose of the existing three cell arrangements (as may be continued in Cerberus CC, Janus CC, and Orion CC) is to protect the Clinic against a multitude of loss exposures beyond those economically covered by commercial insurance based upon ISO-form policies commercially available through, for example, Liberty Mutual, Zurich, The Hartford or Travelers.

We note that the nature of your business presents good examples as to why property & casualty insurance companies are formed in the first instance. That is, there exists otherwise uninsured but insurable risks (that is, "coverage gaps") associated with owning and operating a speciality hospital, with over 90 physicians having privileges and having hundreds of support staff across several businesses, your dependence on key employees (e.g., the Clinic's CEO Cheri Saltaformaggio, and CFO Sarah Underwood, CPA), the loss of whose services would result in lost business/added costs, all in addition to billing operations for multiple entities, along with the operations of at least three medical practices. Additionally, there exists the multitude of risk factors beyond your control (e.g. changes in medical reimbursement rates, contracts with third party payors, legislative and regulatory restrictions on physician owned hospitals, the ever changing regulatory environment, etc.).

**EXHIBIT A**

# THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 10, 2015)
Page 2

Our clients (that is, clients of Capstone and the Firm) involved with evaluating captive insurance planning commonly have expressed an interest in being free of: (i) the ongoing underwriting, risk management, and day-to-day administration and operations of an insurance enterprise; and (ii) the ongoing involvement of designing, pricing, and administering insurance coverages, and interfacing with regulatory authorities. For these reasons, we usually are asked jointly to handle these matters on a turnkey basis, as was done by you in this instance.

To help accomplish these tasks, the Firm has associated itself with Capstone Associated Services (Wyoming), Limited Partnership and its affiliate, Capstone Associated Services, Ltd., a Texas limited partnership (collectively "Capstone"), which is owned by certain of the Firm's lawyers and related parties, to provide many of the needed insurance, underwriting, accounting and other non-legal support services.

Our Firm's work and Capstone's activities, as described below, will be performed in our collective multiple capacities on behalf of, as appropriate: (i) the owners of the captives insurer in connection with the formation of the captives; (ii) the Clinic and certain of its affiliates as the insureds; and (iii) the captives, Cerberus CC, Janus CC, and Orion CC, as the insurers. At all times you (whether directly or indirectly through the captives) will have exclusive control over the monies in the captives and its various investments, subject to the captives' compliance with insurance regulatory requirements calling for either a given level of reserves or a particular form of securities in which they must be held[1]. Neither Capstone nor our Firm will handle the checkbook or the brokerage investment accounts, nor will we advise on the specific investments being made by the captives. However, our Firm and Capstone (and persons acting on behalf of these entities[2]) will handle the design, formation and all aspects of the insurance operations on behalf of the captives, including operating the captives, designing and maintaining the risk coverages, complying with the domicile's investment diversification requirements and maintaining the captives' accounting records. We will also endeavor to make available to you an insurance pooling arrangement through PoolRe (see Exhibit E) which Capstone administers on behalf of many joint clients of Capstone and the Firm (and their affiliated insureds) as well as the owners of PoolRe.

As explained above, our work is generally on behalf of the captives but also at times on behalf

---

[1] At a minimum you should expect that the captives must maintain its initial capitalization (which, assuming the formation is in Delaware, would be $250,000 for the Section 831 (b)-type captive) in first class, non-volatile, marketable securities, usually in the form of income producing, high quality liquid debt instruments. By way of comparison, Anguilla's capitalization would be $200,000, assuming $1,00,000 in first year premiums. These requirements can be met by contributing existing qualifying securities to the captives. The preferred investment would be in bank certificates of deposit or U.S. Treasuries. An amount equal to the year end liabilities will need to be maintained in similar investments.

[2] Note that the Firm and Capstone in turn draw upon the resources of various other service providers (e.g., auditors, risk managers, commercial insurance brokers, outside underwriters, lawyers, Capstone's Texas affiliates, etc.) in providing their services called for under this agreement.

# THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 10, 2015)
Page 3

of the captives' shareholders and of the captives' various insureds[3]. In doing so, both our Firm and Capstone additionally will draw upon the skills and expertise of persons outside of both organizations, at our expense, as part of our overall turnkey fee arrangement unless otherwise noted. These other persons may include local co-counsel, a resident manager (which is a Capstone subsidiary), a resident director in the domicile of choice (e.g., Delaware), actuaries (where applicable), risk managers, the captives' auditors, a company manager (U.K. territories) and registered agent, and other U.S. based professionals, who can be changed only with your concurrence upon our recommendations. Not included in the turnkey package are any fees due to your CPA to review and sign captive related state and federal tax returns as their preparer and any other work requested by you.

More specifically, the Firm's role as your lawyers and the cooperative role of Capstone (and persons working under both) is to provide the following services included in our turnkey fee arrangement:

1. Providing comprehensive tax, legal, accounting, risk, insurance, re-insurance and regulatory planning services designed to address the structuring of the captives arrangement, and conducting the captives insurance company operations beginning with the formation of the new captives.[4]

2. Preparing and filing all tax, legal, and regulatory reports for the captives in all jurisdictions, including formation filings, except the various state premium tax filings (as such may exist) and the federal Form 990 (or Form 1120 PC, as appropriate) will be drafted by us for review and revision and ultimate completion, signature and filing by your CPA who will serve as the preparer of all tax returns (see footnote 4). Your CPA's compensation is your sole obligation.

3. Coordinating - and together with the rest of our team, performing - the structure functions of an ongoing insurance business, including structuring insurance coverages, drafting insurance policies, obtaining independent quotations and premium reviews, obtaining audits by an independent CPA firm qualified to practice before the regulatory authorities of the chosen domicile and preparing statutory reports to the captives' regulators.

4. To the extent you decide to do so as part of meeting the generally recognized

---

[3] We note that in order for Capstone to properly maintain the accounting records for Cerberus CC, Janus CC, and Orion CC, your bank/broker must send the original bank/brokerage statements to the captives' Delaware or Anguilla office address which is the primary address of Cerberus CC, Janus CC, and Orion CC, with a copy of all bank/broker statements (including copies of cancelled checks, deposit slips, etc.) to Capstone, with of course another copy being directed to you, as an officer of the captives.

[4] Given that the insurance policies, the third party risk pool and captive management was done by the previous captive manager for 2015, we think the previous manager should be responsible for the 2015 financials, reporting and tax returns. Given the difficulty in receiving the information so far, we think this is a practical necessity. We understand that the previous captive manager has been paid for 2015 work, so this is not an issue.

THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 10, 2015)
Page 4

> criteria set forth in applicable case law on this issue, endeavoring to procure for your consideration and evaluation, unrelated insurance business (reinsurance assumed) for the captives at a prudent level for fiscal policy periods beginning 12/31/15.[5] As part of this program other third parties will consider underwriting your insured's coverages. See Exhibit E.

5. Administering the entire operation of the captives in a prudent and cohesive manner to ensure compliance with laws and regulations in the captives' domicile as we understand them currently.

6. In this regard, please note the division of responsibilities between Capstone and the Firm. Advice and counsel as to the legal, tax and regulatory issues will come from the attorneys of the Firm. Neither Capstone nor its employees and representatives provide any legal, tax or regulatory advice, and although Charles Earls is a CPA, he provides no public accounting services through Capstone or to the clients of either Capstone or of the Firm. Also, because the officers and directors of the captives retain the ultimate decision whether to underwrite a particular risk, Capstone does not perform underwriting in the traditional sense, although it does make recommendations on risk coverages and policy pricing. The function of Capstone is to execute the numerous oversight and administrative responsibilities required by the captives in accordance with the guidance provided by the captives' resident manager, legal and other advisors, and you as the officers and directors of the captives. To be clear, however, Capstone is a significant client of the Firm and the intellectual property which comprises the captives insurance planning being undertaken is exclusively the property of Capstone.

7. We will work with the current banking and captive management providers to re-establish the bank account's ownership as that of the separate Delaware captives. Neither Capstone nor our firm ever holds authority to sign on clients' accounts or make investment decisions on their behalf.[6]

Services such as the following are not included in the scope of this turnkey agreement (whether from the Firm or from Capstone): (i) providing risk management services to any person or assisting in the acquisition of conventionally available insurance; and (ii) engaging in the promotion, negotiation, sale or contract finalization of any agreements of insurance in

---

[5] We recommend a limited amount of unrelated insurance coverage (i.e., to cover insureds which are not a part of your affiliated group to the extent of 30%-50% of net written premiums). Historically, we have recommended 30% but are more recently suggesting the 50% level. For more on this issue, see Exhibit C. If you elect to do so, we will assist you in this regard as part of our turnkey package of services. See Exhibit E. Note that pooling and other third party insurance is offered in conjunction with PoolRe Insurance Corp., which is independently owned by a third party but is administered by Capstone under the direction of PoolRe's officers and directors. The Feldman Law Firm LLP also does occasional legal work for PoolRe.

[6] Note that there is pool money being held that continues on at least through March 1, 2016 and subjects the three cells to losses.

TWO POSTOAK CENTRAL ● 1980 POST OAK BLVD. ● SUITE 1900 ● HOUSTON, TX 77056-3877 ● 713/850-0700

THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 10, 2015)
Page 5

the State of Louisiana.[7] The Firm's and Capstone's role relates to the various aspects of the cells captives' operations and their ongoing operation and may extend to the optional Delaware captives as well.

**Term of Agreement.**  Our services under this engagement letter are for an initial five plus year term, during which our fees will remain fixed as set forth herein.  Drawing on the Firm, Capstone will design and write for review and binding by your captives, 12-month insurance contracts (that is, fiscal year contracts) for the twelve months beginning December 31, 2015. It is expected that the captives will apply to PoolRe for participation in the annual pooling arrangement, subject to satisfying PoolRe's criteria which it sets from time-to-time.  See Exhibit E.

As discussed above, this is a five plus year agreement ending August 31, 2021.  Following appropriate notice as set forth herein, you may cancel these ongoing services (which ends Capstone's ongoing responsibilities as of August 31, 2021 under the "Service Agreement", a copy of which is enclosed as Exhibit B) and in conjunction with doing so, also end Capstone's and our Firm's our ongoing responsibilities.  Because of: (i) our need to commit personnel to the operations of the captives, (ii) our commitments to our associates, (iii) the tail on certain coverages being underwritten by your captives, and (iv) the significant up front work, should the nature of our relationship change at the end of the initial term, written notice to us must be received prior to December 31, 2019.  In all cases of termination, the effectiveness of the cancellation notice is predicated upon all payments due Capstone and the Firm being current as of the time that written notice is given.  If terminated by you in this fashion, no further payments will be due for work done after August 31, 2021, at which point our services will cease and our obligations under this agreement will terminate.   If not terminated by you in this fashion, i.e., by advance written notice given by December 31, 2019, this agreement will automatically renew for a three year term under the same financial arrangements, the first such renewal period being September 1, 2021 - August 31, 2024; furthermore, every three (3) years, this agreement will renew (i.e., absent our timely and qualifying receipt of notice to terminate), so as to always provide Capstone and the Law Firm at least twenty (20) months notice of any change in our relationship.

**Reorganization of the Cell Captives Into Standalone U.S. Captives.**  We understand that you have concluded, after seeking inputs from your outside counsel and CPA, to have our Firm (and Capstone) move forward with a tax free reorganization of The Bahamian cell captives into three standalone U.S.-domesticated captives, done on a tax free basis.

The reorganization will include the formation of new Delaware captives, and the production of a full insurance application, business plan and financial proformas.  That is, we are starting from scratch by forming three, U.S. captives and organizing the three cells into these newly formed entities on a tax free basis.  Assuming that we will be doing the reorganization from all of tax, legal, financial, and insurance standpoint, our fee will be included in the overall fees paid to Capstone (and then paid by Capstone to the Firm for the Firm's services) that will begin

---

[7] If your captives are domiciled outside the U.S., your captives will be taking the reporting position that it does not engage in the insurance business in the United States.

THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 10, 2015)
Page 6

on December 31, 2015 and continue through at least August 31, 2021. Note that this project encompasses, in addition to the design, formation, organization and assistance with funding of these three new captives, the tax free acquisition of the cell assets (or the entities) and the tax filings associated with same.

*Ownership of Reorganized Cerberus CC, Janus CC, and Orion CC; Officers and Directors.* We have preliminarily discussed that Cerberus CC, Janus CC, and Orion CC will continue to be directly owned by Dr. Scott K. Sullivan and Dr. Frank J. DellaCroce, all as currently existing.

Delaware requires a resident director, and in this regard we propose Dana Moore, who currently serves as the resident director and local agent for our other Delaware entities. Ms. Moore is not intended to be an officer, and you will appoint two directors, giving you a majority on the board. Fees for the resident director (if the decision is made to form in Delaware) are included as part of our turnkey fee.

*Capstone.* The Captives will engage Capstone which will serve as the resident manager, or it will engage a resident insurance manager on behalf of each captive in Delaware to assist in the ongoing services needed to properly implement and administer this planning. The responsibilities of Capstone (relative to those of the Firm) are set forth in Exhibit A and with the Services Agreement (with Capstone) for the captives attached as Exhibit B. Our Firm will work with the designated team of professionals and related service providers (that is, we will quarterback the overall planning for your captives and coordinate our work with your CPA and with the domicile manager, etc.[8]) although our Firm reserves its rights to upwardly adjust its fees in the event a team other than that of Capstone and the Firm is chosen by you. The respective responsibilities of Capstone and the Firm (and subsumed within such, the work of the resident manager) and other third parties working under Capstone's administration and with the Firm's direction have been set out in a manner so that, as between these organizations, all aspects of the initial set-up and ongoing administrative or regulatory work will be conducted either by the Firm or Capstone, each acting from time-to-time as circumstances warrant on behalf of either (i) the captives, (ii) the insured(s), (iii) the captives' owners, or (iv) the resident manager. This is intended to ensure that all of the many moving parts of the captives' planning are professionally and timely handled. This is also in furtherance of the responsibilities of the Firm in the case of a state or federal tax inquiry (see pages 11-12) or a domicile audit.

Unless otherwise expressly set forth herein, you agree to engage our Firm, Capstone, and the designated resident manager to carry out their called-for duties and responsibilities. Recognizing that the fees quoted below are based upon a Delaware incorporation and domicile, and the term agreement specified with the pattern of fees set forth herein, as opposed to being

---

[8]We note that changing the members of the team, for example, by having our Firm work with other auditors or resident managers, will result in duplicate work, redundant costs and likely extra fees on our part related to the increased complexity and administrative burden. As noted above, an affiliate of Capstone, CIMA, will also provide services to Cerberus CC, Janus CC, and Orion CC, all of whose fees are included in the overall turnkey fee. The voluntary or involuntary termination of the Firm will nonetheless obligate Capstone and Capstone obligates you to this agreement for the contract term provided herein in all situations.

# THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 10, 2015)
Page 7

front weighted in recognition of large amount of up-front transition work being undertaken. Capstone's affiliate, Capstone Insurance Management, Ltd. ("CIMA"), which is also an affiliate of the Firm and under common ownership, is the anticipated insurance manager.

**Fees.** In the captives' initial years, there is a substantial amount of legal design and drafting, technical insurance planning, regulatory approval, financial and administrative work, all of which is reflected in the amount and timing of our fees. The purpose of our assignment is to continue to assist you in operating the existing cell arrangement and likely transitioning such into U.S. domiciled, standalone captive insurers.

We understand that you are directing us to undertake the reorganization portion of the assignment. Additionally, our work includes in addition to the ongoing management of the captives, preparing the application for the captives, obtaining the necessary approval from Delaware's Director of Insurance to form and operate your insurance companies, actually forming, organizing and capitalizing the insurance companies, and assisting you in identifying the risks to be insured (with you retaining all decision making on coverages and policy pricing) and preparing the necessary policies to evidence those risks being borne by the captive insurance companies along with obtaining third party quotations for the costs of such coverages in the marketplace. At least two conferences or in-person meetings are expected to be held by the resident manager yearly with the Delaware Insurance Commissioner or the Commissioner's staff. We will make available to the three cells (as may evolve into Cerberus CC, Janus CC, and Orion CC), as an option, the ability to participate (subject to satisfying the pool criteria) in unrelated insurance risks, in which the captives may (or may not) participate, subject to compliance with the program's terms. We will provide up-front and ongoing legal and tax support for the overall alternative risk planning structure.

In addition we will prepare documents to facilitate the exit of the three cells from the overall cell arrangement and oversee the return of assets to your cells. In this regard, we understand that monies are on deposit with the core or with an existing pooling arrangement.

We understand that at some point you will want assistance in handling the investment of the captives' excess reserves (that is, what remains after the captives' expenses and losses) whether those be investments in bonds, certificates of deposit, stocks, loans to affiliates, or participation in other planning for your captives' hoped for residual retained profits. While we are not investment managers, we will assist in the legal and, through Capstone, the regulatory, accounting and reporting aspects of such investment activities. See below. Note, however, that a captive is a regulated insurance company, and in this regard, its investment and operations are subject to the regulatory oversight in the chosen domicile. To be sure, the captives cannot be operated as a personal checking account.[9]

---

[9] By way of example, you should not expect that in Delaware any more than 40% - 50% of the captives' "excess" reserves (generally being the amount in excess of the captives' initial $250,000 capitalization plus all liabilities plus perhaps a margin) can be loaned back to your operating entity, which itself is a special concession made to Capstone-administered captives in, for example, Delaware because of our recognized experience in administering captive and history of performing as directed by insurance regulators. For federal tax purposes, however, we recommend that clients keep these affiliated loans in the usual case at less than 50%. The lower the better. Nonetheless, the types of investments and the amount able to be put into each category are governed

THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 10, 2015)
Page 8

Our workload, which is very substantial in the early years of the captives' formation and organization, may level off somewhat thereafter, which is generally more than offset by what we find are more active captives as their capital builds and as other planning opportunities therefore become more available. At some point you may ask the Firm to assist in distributing the captives' profits and even shutting down the captives; we stand ready to assist in that regard as part of our regular, quarterly retainer, without further charge.

As is true of any business enterprise, there is some uncertainty in the amount of costs and expenses which we will incur in providing this service. In complex endeavors such as this, there is an extra level of unpredictability in quantifying such costs, recognizing that you desire as much certainty as possible in committing to this project. To this end, we have assembled a turnkey service package[10] and fee structure which only *excludes*:

> (i) any taxes or related payments which any State government, any other country or the Internal Revenue Service (IRS) assesses or is due on or with respect to: (a) the captives; (b) the insured companies; or (c) the parent-owners[11].

> (ii) any financing activities involving the captives and other legal work (e.g., a real estate transaction) beyond our preparing general secured loan agreements (i.e., standard secured lending where accounts receivables are the primary security) (subject to the fee set forth below) which we will endeavor to dovetail with your existing lines of credit. More tailored factoring plan design and implementation, legal document drafting and related work will be billed at the Firm's and Capstone's standard billing rates; and

> (iii) other expanded captives planning opportunities beyond that outlined herein, such as having the captives acquire, finance or participate in real estate investments or estate planning or trust work.

In general, Capstone's turnkey fee (which is inclusive of fees then paid by Capstone to the Firm) is inclusive of such significant matters as compensating the statutory captives manager (one of our affiliates), all Delaware insurance licensing and Delaware corporation fees and all

---

by numerous Delaware regulations, which change from time-to-time.

[10] Of course, any underwriting or investment losses are the responsibility of your insurer (and similarly any such gains accrue to its benefit) and are not the responsibility of either Capstone or the Firm.

[11] Under current law, the proposed structure of Cerberus CC, Janus CC, and Orion CC as intermediate captives would result in the captives being: (i) free of local income taxes (but not the myriad of fees for licenses and filing fees which is part of Capstone's fixed fee arrangement) in the chosen domicile; and (ii) free of U.S. income and excise taxes on the captives' underwriting profits. Investment income is taxed as in a C corporation. Federal, state and local taxes may be due upon the captives' wind up and liquidation or upon dividends being paid.

## THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 10, 2015)
Page9

financial audit fees, statutory triennial audit, annual independent CPA audit[12] and other
"standard services" (as set out in Exhibit A) being provided by Capstone and by our Firm.
However, fees for services requested that are beyond those specified as standard services or
for work beyond the services contemplated by this Agreement, will be charged at standard
rates of the Firm or Capstone, as the case may be. By way of example, if you decide to seek
regulatory approval to have your captives make a mortgage loan to an affiliate to finance a
building, we would separately charge to make application to the Delaware Department of
Insurance for such a use of the captives' assets as a permitted investment and to perform (if
you so request) the legal work related to the financing. Additionally, should you ask our Firm
to represent you in a real estate acquisition, we also would separately charge for such
services. Generally, however, we seek and usually obtain up-front permission from the
domicile's regulator for certain types of corporate lending such as loans to operating
businesses, which are nonetheless subject to additional regulatory limitations.

The overall fees, which are paid to Capstone (which in turn pays the Firm for legal work
undertaken whether or not in excess of the total fees paid) for their respective services, total
as follows:

> ✱ *Calendar Years 1 - 5 (December 31, 2015 - August 31, 2021):* Given a broad
> range of coverages with premiums for each captive being no more than
> $1,000,000± each, with coverages spread among your operating entities:

- installments of $11,875 per quarter per captive for calendar year 2016
  (($160,000-$17,500)/[4 quarters x 3 captives]);

- installments of $13,334 per quarter per captive for the first half of 2017
  ($160,000/[4X3]); and

- installments of $16,000 per quarter per captive for the second half of
  2017 through August 31, 2021 ($192,000/[4X3]).

Payments are due January 1st, April 1st, July 1st and October 1st of each year
(2021 being prorated), such inclusive of both Capstone's and the Firm's efforts.
See footnote 6. If you elect to engage in secured corporate lending to affiliates,
our ongoing fees increase by $2500 per captive per quarter due for the whole
of any calendar year in which a loan is outstanding. If there are similarities in
the secured lending arrangements there will be some economies of scale which
we will pass onto you. Note that the existing unsecured lending arrangement
should cease. Please see enclosed Guidelines on Administration and Billing.

*RISKS AND RESPONSIBILITIES.* It is our intention under this planning to elect special tax
treatment as to the insurance and investment operations of Cerberus CC, Janus CC, and Orion

---

[12] The audit will be performed on a scheduled turnkey basis by a domicile-licensed independent auditor,
at Capstone's choice, or by another accounting firm recommended by Capstone, subject to your prior approval.
In all cases, the auditing firm must be licensed and approved by the regulators. The first audit will likely be for the
combined period of formation through December 31, 2016.

## THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 10, 2015)
Page 10

CC under relevant provisions of the Internal Revenue Code and to obtain tax deductibility for the premiums paid to the captives by the affiliated insureds. This planning assumes that the captives' aggregate direct and pooled net written premiums are no more than $1,000,000.00± per calendar year, which seems reasonable based upon the preliminary information from the feasibility study, and that other legal, regulatory, and judicial requirements of the planning (e.g., premiums do not exceed $1.2 million/year, the captives conduct themselves as insurance companies, etc.) are respected. See Exhbit C attached.

Should the IRS challenge the planning being done herein as to its IRC Section 831(b) status, subject to the timely payment by you of the fees due us from time-to-time, such fees being in all ways current, and the uninterrupted and continued retention of the Firm and Capstone for the scope of services described in this agreement, the Firm agrees to represent you without further payment of legal fees in any IRS audit (either field, office or by mail), before IRS Appeals, in an IRS mediation, and then, if appropriate, file on your behalf a petition and an opening legal brief in the U.S. Tax Court regarding the issues related to the planning being done herein under IRC Section 831(b) (and no other issues but those specified herein). Note that our obligations under this paragraph run only for federal or state tax challenges which relate to the captives' operations post-December 31, 2015 (the beginning of Capstone's and the Firm's role) and not for prior work done by your existing service providers. To be clear, legacy work is not covered, but the Firm is likely willing to take on any challenge under a separate fee agreement.

In the history of Capstone and our Firm with respect to alternative risk planning dating back to our beginnings in 1998, we have never gone beyond this point (that is, the point covered by our fixed fee arrangement) and have been able to resolve issues satisfactorily (that is, with "no change") well short of even basic discovery in the U.S. Tax Court, which (as noted) is outside of the scope of the fixed fee portion of this agreement. Of course, in connection therewith, we cannot guarantee any particular result, and several others are still in process.

As we have discussed previously, this planning technique— as well as other types of advanced business and tax planning – involves inherent risks and should only be undertaken by those who understand and can evaluate and bear such risks. A non-exhaustive but lengthy discussion of the risks plus other pertinent issues (e.g., a detailed summary of our experience with the IRS in these planning areas) are set forth in the attached Exhibit C. See also the materials listed on www.CapstoneAssociated.com. In connection with our work, it is additionally important that you commit to retain the services of a highly competent and diligent CPA, whose involvement is critical to maintain the interface of the Clinic and your captives, and to review and file the various state and federal tax returns which will be presented in draft form for signature.

***ADDITIONAL PLANNING.*** Captive insurance planning opens up the opportunity for related business, financial and tax planning. This and other opportunities will be brought to your attention for your consideration. As discussed previously, these additional planning matters are not included in the turnkey fee arrangement discussed above, and for such work we would separately invoice you if requested to perform such.

THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 10, 2015)
Page 11

Please sign below and return a copy of this agreement to us to that Capstone and our Firm can continue our joint work on this project. We look forward to working with you.

Very truly yours,

Stewart A. Feldman on behalf of
Capstone and the Firm


enclosures:    ■Engagement Retainer Invoice

■Guidelines on Administration and Billing (applicable to both the Firm and Capstone)

■Exhibit A - Duties and Responsibilities: (i) of Capstone Associated Services, Ltd.; and (ii) of THE FELDMAN LAW FIRM LLP

■Exhibit B - Services Agreement

■Exhibit C - Tax Risks Inherent in §831(b) planning

■Exhibit D - Brief Description of Types of Captives

■Exhibit E - Supplement on Third Party Insurance

*CIRCULAR 230.* I may ask the Attorney's advice regarding federal tax issues. The Internal Revenue Service (IRS) does not allow me to rely on informal tax advice rendered before I file my tax return to avoid tax penalties. If I want to rely on the Attorney's federal tax advice to avoid tax penalties, the IRS requires the Attorney to issue formal written tax opinions regarding the tax issue(s). Formal written tax opinions are not within the scope of this engagement. The IRS rules also prohibit someone else from using the advice the Attorney provides to me. All communications from the Attorney are intended for my use only and include, and are intended to reflect, in substance, the following notice:

> *Treasury Circular 230 Disclosure:* To the extent this communication contains any statement of tax advice, such statement is not intended or written to be sued, and cannot be used, by any person for the purpose of, or as the basis for, avoiding tax penalties that may be imposed on that person. This communication is not intended to be used, and cannot

# THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 10, 2015)
Page 12

be used for the purpose of promoting, marketing, or recommending to another party any matter addressed in this communication.

This legend is attached pursuant to U.S. Treasury Regulations governing tax practice, to comply with requirements imposed by the Internal Revenue Service. I will let the Attorney know if I want a formal, legal opinion regarding tax issues. I agree to sign a separate engagement letter with the Attorney to show I want such an opinion. I understand that the cost of such an opinion will be substantial given the IRS requirements.

APPROVAL TO PROCEED AS DESCRIBED ABOVE:

_____
Scott K. Sullivan, M.D.

_____
Date

_____
Frank J. DellaCroce, M.D.

12/7/15
Date

copy:   Capstone Associated Services, Ltd. *(w/encl.)*
        att: Charles B. Earls III, President
        Two Post Oak Central
        1980 Post Oak Blvd., Suite 1950
        Houston, TX 77056-3877

        David Kushner, CPA *By email*

        David Sherman, Esq. *By email*

## CLIENT INFORMATION: GUIDELINES ON ADMINISTRATION & BILLING

As with any type of legal representation, advanced financial structuring or sophisticated business planning, no one can provide guaranties regarding the outcome of any matter. We do commit, however, to use reasonable care and put forth a diligent effort on your behalf. We also commit to keep you informed as to the status of your representation and to provide you, where possible, with available alternative courses of action.

The Feldman Law Firm LLP (the "Firm") provides open communication regarding the status of your legal affairs. Access to persons know ledgeable about your legal affairs will always be available. Your phone calls will be returned promptly. Every attempt will be made to respond to emergency situations. Throughout our engagement, copies of all significant documentation relating to your legal affairs will be provided to you on a timely basis. The Firm's files of your matters are available for your inspection.

You have agreed that attorney Stewart Feldman, or another attorney in the Firm, has primary responsibility for the supervision of your legal affairs under the parameters of the engagement letter, and recognize that other attorneys in the Firm will provide services to you from time-to-time. Should you have any problem communicating with anyone, or should you have any concerns regarding attention to your legal affairs, please contact Mr. Feldman immediately.

For any additional work beyond that described in a fixed fee engagement letter with either Capstone or the Firm, you will receive a regular statement for such attorney's fees and expenses incurred in your representation. Each invoice will be itemized setting forth specific work performed and expenses incurred. The Firm bases its billing on hourly rates (customary hourly rates range from $195 - $495 for attorneys with paralegal staff at $100 - $195 per hour. Capstone rates range from $125 - $225 per hour. Although hourly rates are the basis for billings, we review each bill and the actual amount billed may be greater or less than that derived from the hourly rates, such adjustment based upon the novelty and complexity of the issues involved, the skill required to provide proper legal representation, the magnitude of the matter, the results achieved, the time frame required for handling the matter and any other circumstances which have a material and direct impact on the reasonable value of the legal services performed. From time-to-time, billing rates are modified to reflect a particular expertise and the changing cost of providing legal services. We will provide you, at any time upon your request, a current list of hourly rates. Note that all retainers, deposits and payments are deemed fully earned when paid and are for the reservation of the organization's time to do the called for work, in addition to the obligation to do such work.

Expenses advanced will be billed with the monthly invoice for matters such as photocopy charges, fax charges, delivery fees, filing fees, certified mail charges, travel expenses, court costs, deposition costs, electronic research services, secretarial overtime (when necessary to comply with your time requirements) and other expenses. You authorize us to retain and direct such other persons and companies to render services on your behalf as may be necessary and you further agree to reimburse us at the time of our invoice for any expenses thereby incurred. Of course, we will confer with you before incurring material expenses on your behalf.

All invoices are due upon receipt. If an invoice is not paid within twenty (20) days from the invoice date, the amount due shall accrue interest at the rate of 18% per annum from the invoice date until paid (unless that rate exceeds the maximum legal rate, in which case the maximum legal rate of interest shall be charged). Should Capstone or the Firm be required to take formal action to recover any amounts owed it under your engagement letter agreement or any invoice, you agree that the Firm will be entitled to recover reasonable attorneys' fees and costs. Although we may provide services to your trusts, corporations, partnerships, and/or other entities, we look as well to the owners of our clients to personally insure payment of all legal fees for work undertaken and each of the owners of our clients agree to assume personal liability for these sums.

You understand and acknowledge that although we will endeavor to provide you with recommendations and alternatives based on our best judgment, there can be no guarantee of successful consummation of any transaction, that each decision must be your own, and that the ultimate responsibility of each decision must necessarily be yours. Accordingly, you may incur substantial fees and other expenses in connection with matters we will handle on your behalf, even though you may not achieve your desired result. Unless expressly stated otherwise in writing, any U.S. federal tax advice provided by this Firm or its lawyers, is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any penalties that may be imposed by the Internal Revenue Service.

GUIDELINES ON ADMINISTRATION & BILLING
CAPSTONE AND THE FIRM

Page 2

Additionally, please note that The Patient Protection and Affordable Care Act (H.R. 3590), signed into law on March 23, 2010, codifies a federal income tax doctrine known as the "economic substance doctrine." Under this new legislation, a transaction has economic substance only if the taxpayer's economic position (other than its federal tax position) changed in a meaningful way and the taxpayer had a substantial purpose (other than a federal tax purpose) for engaging in the transaction. The new law states that profit potential may be taken into account only if the present value of the reasonably expected profit from the transaction is substantial in relation to the present value of the expected net tax benefits that would be allowed if the transaction were respected. Furthermore, financial accounting benefits arising out of a reduction in federal income tax are disregarded in determining whether the taxpayer has a substantial purpose for entering into the transaction.

Failure to demonstrate the economic substance of a transaction will be subject to an automatically-applied penalty equal to 20% of the underpayment (40% if the transaction is not adequately disclosed on the tax return). The new law imposes virtual strict liability for these penalties by eliminating the reasonable cause and good faith defenses otherwise available under existing law.

You may terminate our legal representation at any time upon written request. The Firm may withdraw from your legal representation should: (i) it believe such continuation is prohibited by the Code of Professional Responsibility; (ii) you fail to comply with our agreements as reflected in your engagement letter or any subsequent agreements or commitments to the Firm; or (iii) the Firm believes, for any reason, the attorney/client relationship is compromised or has been detrimentally affected. In the event the Firm withdraws, you agree to promptly retain other legal counsel. Upon termination or withdrawal, you agree immediately to pay all accrued and outstanding attorneys' fees and expenses including through the conclusion of any fixed price assignment or for a given term, plus subsequent fees incurred by the Firm to facilitate the transfer of representation to any subsequent law firm and/or for the Firm to fully and completely withdraw. If you have contracted with Capstone, the withdrawal of the Firm will not affect Capstone's obligations to you or your obligations to Capstone, which as to called for non-legal services and fees shall be undiminished.

***POTENTIAL CONFLICTS.*** When we are asked to provide legal services for more than one person (e.g., multiple owners of a business or a husband and a wife in an estate planning assignment or a business matter), conflicts may arise. If we are to act as attorneys for multiple persons, we must balance the interests of all persons involved. Therefore, we cannot be an advocate for any one person against another in the case of multiple representation. The process could favor one to the detriment of the other. By way of further example, a substantial conflict could arise in the determination of what constitutes community property versus separate property. That determination may be more beneficial for one spouse than the other. Further, while divorce may not be contemplated, it is important to realize that estate planning, and especially estate planning that incorporates declarations of gift, could have consequences that either spouse may find adverse in the event of divorce. As an additional example, because the Firm represents and Capstone administers many insurers (captive and otherwise), including for those of affiliates of the Firm and Capstone, the Firm will not take on representation adverse to or to the detriment of or against those persons within the scope of the Firm's representation. Similarly, our recommendations could affect the income, property, and support provisions in any divorce or after the death of one of the spouses or that of one business partner versus another. For these and other reasons, each person or entity is advised to and welcome to have separate counsel.

*        *        *

Should any dispute arise out of or in conjunction with the attorneys' fees and/or costs and/or expenses of the legal work previously performed for you or your affiliates by THE FELDMAN LAW FIRM LLP or its lawyers, agents or principals that cannot be settled by good faith negotiation between the parties, either party may submit the legal fee dispute to the Houston Bar Association's Fee Dispute Committee for binding and nonappealable resolution, which shall be the sole and exclusive forum to resolve disputes regarding legal fees but not otherwise. Note that while we hope that any dispute will be amiably resolved directly between us, the State Bar of Texas investigates and prosecutes professional misconduct of Texas attorneys. Should you have any questions, the Office of the General Counsel of the State Bar will provide you with information regarding the Bar's procedures.

GUIDELINES ON ADMINISTRATION & BILLING
CAPSTONE AND THE FIRM

Page 3

With respect to any and all other controversies, disputes or claims whatsoever between (x) the Firm (including its lawyers) and/or its affiliates (including Capstone Associated Services, Ltd., Capstone Insurance Management (Anguilla), Ltd., and/or Export Assurance) (including their employees, officers and directors) and (y) any client of the Firm and/or its affiliates related to or arising out of the Firm's or its affiliates' services or arising under  or in connection with or related to any of the parties' agreements (but in no event for attorneys' fees for services previously rendered, see preceding paragraph), either party may submit the dispute to any recognized, neutral (x) arbitral association or (y) arbitrator for final resolution in an arbitration proceeding to be concluded within four months, except that the American Arbitration Association (AAA) shall not administer the arbitration. Submission of the dispute to arbitration under this agreement shall be the sole and exclusive forum for resolving any and all disputes between the parties, except for attorneys' fees for services previously rendered which are before the HBA's FDC.

Except as to the HBA's FDC which shall apply its own rules, all arbitrations — regardless of the arbitral organization or arbitrator actually hearing the dispute — shall be conducted in Houston, Texas applying Texas substantive law pursuant to the Commercial Arbitration Rules (and not the rules for Large, Complex Commercial Cases) of the American Arbitration Association (AAA)then in effect, whose Expedited Procedures shall apply regardless of the monetary size of the dispute or the number of parties to the proceeding, with only a single arbitrator hearing the dispute, again all regardless of the organization sponsoring the arbitration in question. All parties acknowledge and agree that this arbitration agreement modifies the AAA arbitration rules regarding, inter alia, the selection of the arbitrator and the administration of the arbitration in that: (1) either party may directly appoint the single arbitrator or the arbitral association who/which shall proceed to resolve the dispute, provided that the arbitrator is recognized and neutral; (2) the AAA is not required to administer and shall not administer the arbitration; and (3) any recognized and neutral arbitrator himself/herself or arbitral association may administer the arbitration. The arbitrator or arbitral association appointed to resolve the dispute shall have the sole and exclusive ability to rule on all aspects of the arbitrator's appointment,  including, but not limited to, disputes or challenges of bias and neutrality.

In all cases, the parties shall be deemed to have adopted the Optional Rules of the AAA For Emergency Measures of Protection (regarding injunctive or equitable relief, which requests for relief shall exclusively be submitted to the arbitrator). In all events, the parties waive the right to trial by jury in any action or proceeding.  This arbitration provision shall be effective notwithstanding any actions that may later take place. The parties agree that the issue of arbitrability shall likewise be decided by the arbitrator, and not by any other person.  That is, the question of whether a dispute itself is arbitrable shall be decided solely by the arbitrator and not, for example, by any court. The parties agree that the arbitrator has exclusive authority to resolve all disputes and challenges to the formation and enforceability of this arbitration agreement, and decide all disputes or challenges to the enforceability of the parties' agreements as a whole.  The parties agree that their intent is to divest the courts of all powers in disputes involving the parties, except to compel arbitration, and to confirm, vacate or enforce award. The courts shall have no jurisdiction over legal or equitable (including injunctive) matters. The arbitration decision shall be final and binding in all respects. Any person may have a U.S. District Court or another court of competent jurisdiction enter the findings of the arbitrator for all purposes, including for the confirmation and enforcement of any award.

If the first arbitrator or arbitral organization which receives a written demand for arbitration of the dispute from either of us does not complete the arbitration to finality within four months of receiving the written demand, any party then may file another written demand for arbitration of the dispute with another recognized, neutral, arbitrator or arbitral association, with the prior arbitrator or arbitral association then being immediately divested of jurisdiction, and the replacement arbitrator or arbitral association being required to render a final award within four months of the new, written demand being filed with the replacement arbitrator or arbitral organization.  The replacement arbitrator shall not be the original arbitrator. Additionally, the parties agree that the dispute resolution process set forth above concerning the first (non-HBA FDC) arbitration demand, shall apply to every subsequent arbitration.  We look forward to working with you.

September 18, 2015

## Exhibit A

### Respective Duties and Responsibilities of
### Forming and Operating Captive Insurer by the Firm and Capstone

The following duties and responsibilities are the standard services to be independently provided for under the joint engagement agreement by the persons shown below.

**Duties and responsibilities to be performed by The Feldman Law Firm LLP:**

■ Research and design of the overall business and financial plan so as to help ensure that the federal tax and legal definitions of what constitutes insurance are met.

■ In the instance of a Section 501(c)(15) captive, prosecuting the application on behalf of the captive with the Internal Revenue Service to provide for tax exempt treatment under the Internal Revenue Code.

■ Preparation, filing and prosecution of an election with the IRS to be taxed as a domestic U.S. corporation, assuming that the captive is foreign domiciled.

■ Research and design of the various corporate and business entities available and relationships to help ensure compliance with appropriate tax, legal and regulatory requirements.

■ Research and design of the tax structure to help ensure among other things that controlled foreign corporation status is avoided.

■ Research and design of the plan for repatriating the surpluses.

■ Feasibility analysis and selection of the operating domicile.

■ Preparation and submission of the licensing application and other duties attendant to obtaining an insurance license.

**Duties and responsibilities to be performed by Capstone Associated Services, Ltd.:**

■ Coordinating administrative and regulatory activities with the resident insurance manager in the operating domicile.

■ Provide administrative support in prosecuting the application on behalf of the captive to the Internal Revenue Service to provide for tax exempt treatment under the Internal Revenue Code.

■ Coordinating with representatives of the captive the control and management of the cash, investments and other liquid assets of the captive.

■ Assist Firm in the preparation, filing and prosecution of an election with the IRS to be taxed as a domestic U.S. corporation, assuming that the captive is foreign domiciled.

■ Assisting representatives of the captive in establishing and overseeing the bank account and the brokerage account wherein the captive's cash and investment securities are held.

■ Arranging the performance of limited risk management reviews of the insured's loss exposures but only for the purpose of performing the underwriting duties for the captive, which is the process of selecting which of those exposures (the "selected exposures") will be underwritten by the captive insurer.

■ Arranging to have insurance policies written for use by the captive to cover the aforementioned selected exposures.

RESPECTIVE DUTIES AND RESPONSIBILITIES
OF THE LAW FIRM AND CAPSTONE

Page 2 (cont'd)

■ Arranging the incorporation of the captive in the operating domicile.

■ Filing forms with the Internal Revenue Service regarding the initial qualification of the captive.

■ Other actions and executive oversight of Capstone necessary to complete the process of forming the captive insurance company and monitor its operation to ensure proper implementation of the captive planning.

■ Legal services in conjunction with preparing insurance polices and putting insurance polices in force

■ Legal support services of assisting the insured and the insurer in negotiating, in reaching agreement on terms and in putting the insurance policies into force, with such services to be conducted wholly outside of the state of Florida.

■ Legal services associated with the recurring activities of negotiating and settling claims for the insured affiliate.

■ Drafting the factoring documentation and related assistance in the operations of the factoring activities.

*Services beyond those enumerated above as standard services are not included in the services to be provided under this fee agreement.*

■ Obtaining unrelated (third-party) insurance business of a kind that carries with it prudent financial risk parameters.

■ Arranging the performance of claims adjusting and settlement duties. Arranging all loss reserve and admitted asset evaluations to ensure proper regulatory requirements are met.

■ Keeping the internal financial records and providing periodic reports to management. Arranging the required annual audit by an independent CPA firm. Note that Capstone is not a CPA firm and does not itself provide public accounting services.

■ Arranging and recording annual shareholders meetings and preparing annual shareholder reports.

■ Maintaining a Florida office for the captive for purposes of domesticating the captive as a U.S. taxpayer.

■ Arranging for the preparation and filing of appropriate regulatory reports for the captive in the chosen domicile.

■ Arranging for the drafting of annual IRS tax reporting for review, signature and filing by your outside CPA. Monitoring and arranging for preparation, through the Firm, for filing by the insured of quarterly or annual state premium tax reports.

*Services beyond those enumerated above as standard services are not included in the services to be provided under this fee agreement. Capstone's obligation to provide these services are independent of the continuing representation of the Firm to a client.*

## Exhibit B
## CAPSTONE SERVICES AGREEMENT

This Services Agreement (this "Agreement") is entered into at Wilmington, Delaware or at The Valley, Anguilla, British West Indies, by and among: (i) CERBERUS CASUALTY CORP[1]; (ii) JANUS CASUALTY CORP., (iii) ORION CASUALTY CORP. (collectively, the "Companies"), Delaware corporations; DR. SCOTT K. SULLIVAN; DR. FRANK J. DELLACROCE; ST. CHARLES SURGICAL HOSPITAL, and their respective "Affiliates" (as such term is defined herein) including, but not limited to, the Companies (all of the aforementioned collectively referred to herein as the "Client"); and (ii) CAPSTONE ASSOCIATED SERVICES (WYOMING), LIMITED PARTNERSHIP ("Capstone"), a Wyoming limited partnership (which is owned by certain of the Firm's lawyers or their affiliates), and joined in for the limited purposes set forth herein by THEFELDMAN LAW FIRM LLP (the "Firm"), effective as of December 31, 2015. Capstone and Client are sometimes individually referred to as a "Party" and collectively referred to as the "Parties."

#### DEFINITIONS

"Affiliates" means any person directly or indirectly controlled by or under common control with another person (whether such be an individual or an entity of any sort) and, in the case of partnerships, shall specifically include all partners, owners and beneficial holders of a person, and additionally includes their signatories, agents, employees, independent contractors, transferees, assigns, officers, members, directors, those with an interest in and all those in privity therewith. For purposes of this Agreement, in the case of Capstone alone, references to Capstone's Affiliates shall not include the Firm (and its successors and assigns), unless the context expressly so states.

### W I T N E S S E T H

WHEREAS, the Companies conduct property and casualty insurance business domiciled in Delaware;

WHEREAS, the Client is interested in having certain of its operating entities purchase property & casualty insurance from the Companies;

WHEREAS, Capstone is a service provider which provides turnkey administrative services (as described further below) to small property & casualty insurance companies; and

WHEREAS, Capstone offers the Firm's clients the option of having it (Capstone) take on administrative responsibility on a turnkey basis for the captives under a multi-year contract, with Capstone drawing on a variety of outside professionals, including professionals in the Firm, to assist it, with the Firm exercising oversight over Capstone's activities, with the Client having ultimate managerial control.

NOW THEREFORE IN CONSIDERATION OF THE FOREGOING and in connection with the mutual representations, warranties, covenants, and agreements herein contained, and such other due and adequate consideration, the receipt and sufficiency of which is hereby acknowledged, the Client and Capstone hereby agree as follows:

## ARTICLE I
## REPRESENTATIONS AND DECLARATIONS OF THE COMPANIES

The Companies represent that they are duly qualified and licensed insurance companies in good standing as Delaware corporations, operating as insurance companies or otherwise solely in Delaware. The Companies wish to continue to confine their operations to that legal domicile and regulatory jurisdiction. The

---

[1]Assuming the reorganized cells into three standalone Delaware captives. If this option is not elected, the names of the three Bahamian cells will be substituted.

Companies hereby covenant not to undertake any actions in any foreign jurisdiction, and shall both negotiate and issue their insurance policies within the United States.

# ARTICLE II
## COVENANTS OF CAPSTONE

For the benefit of the Companies, Capstone shall use reasonable efforts to obtain the following for the Companies' evaluation and approval: (i) independently procured risks directly written to Affiliates of the Companies' beneficial owners, but only where the procurement of such is outside of the State of Texas; (ii) as to reinsurance assumed (being direct written insurance policies underwritten by other insurance companies which directly or indirectly cede such policies or risks thereunder in whole or in part to the Companies), reinsurance procured outside of the State of Texas; (iii) as to pooled risks of policies directly underwritten by other insurance companies and assumed by the Companies on a quota share basis (hereafter "pooling arrangements"), only to the extent such pooling arrangements are procured outside of the State of Texas; and (iv) from time-to-time such other insurance opportunities as Capstone may identify outside of the State of Texas.

# ARTICLE III
## RELATED AGREEMENTS

This Agreement relates to the joint contractual agreement with the Firm and Capstone set forth in an engagement letter (including all attachments, exhibits and addendums) dated October 22, 2015 (revised October 30, 2015); the "Engagement Letter". Any conflict between this Agreement and the Engagement Letter shall be construed in a manner giving precedence to the Engagement Letter. Further, by execution of this Agreement, the Companies, which were formed after the execution of the Engagement Letter, agree to be bound by the Engagement Letter's terms and conditions as modified hereby, as if made a party to it in the first instance.

# ARTICLE IV
## SERVICES TO BE PROVIDED

The Companies wish to minimize their staffing and to better the quality of their services by contracting with Capstone for the performance of administrative duties for the operation of the Companies, while retaining ultimate decision making authority over the totality of the Companies' operations. Services conducted by Capstone and by persons retained by it are subject to the Companies' ratification of such. With the Client exercising ultimate decision making and managerial control, and with direction from the Firm (which also is acting at the direction of the Client), Capstone shall provide services in accordance with the terms and conditions set forth herein. Accordingly, the Companies hereby contract with Capstone, and Capstone hereby agrees to cause such services to be provided as set forth below.

   4.1    Administrative Services.  The Companies hereby engage Capstone (acting on its own behalf and in connection with its service providers) to contract with third parties, to perform, and Capstone hereby agrees to perform, or to contract with third parties with competence in needed specialties to perform, the designated administrative and/or consultancy services for the Companies as set forth in this Agreement ("Administrative Services"), subject to the terms and conditions herein. In all instances where actions or judgments of Capstone are called for under this Article, such shall be made in the reasonable judgment of Capstone, subject to the Companies reserving the sole and absolute discretion to direct Capstone otherwise by a written notice within thirty (30) days of Companies having actual notice of any such action having been taken which the Companies wish to contradict. Any actions taken by Capstone which are not contradicted by the Companies in this manner shall be deemed to be actions of the Companies for all purposes.

   (a)    Authority.  Consistent with the provisions of this Agreement, Capstone shall have the responsibility and commensurate authority to contract with third parties in Delaware (and other locations) to provide Administrative Services. Capstone is hereby expressly authorized to provide Administrative Services

in a manner as Capstone considers reasonable and appropriate (such to be determined in the sole and absolute discretion of Capstone - subject to the Companies' reserved sole and absolute discretion to direct Capstone otherwise) to fulfill its obligations under this Agreement. For example, Capstone has the authority to terminate and replace the independent auditor, the resident insurance manager and other service providers to the Companies, provided Capstone shall give written notification to the Companies' appropriate officer or director, and Capstone's decision can be countermanded by the Companies' notification to Capstone within thirty (30) days of such notice.

In addition to the Capstone services identified in Exhibit "A" to the Engagement Letter and subject in all cases to the obligations of the Companies to timely furnish all information as described in Section 4.1(n) below, a non-exhaustive list of Capstone's duties and responsibilities, subject to the Companies' reserved sole and absolute discretion to direct Capstone otherwise, under this Agreement follows:

- The maintenance in Delaware of a business office for use on a non-exclusive basis by the Companies.

- Hiring and overseeing the actions of the resident insurance manager in the operating domicile.

- Coordinating with the Companies' officers regarding control and their management of the Companies' cash, investments and other liquid assets, which shall remain within the exclusive control of the Companies' officers and directors.

- Assisting the Companies' personnel, if requested, in establishing the bank account and the brokerage account wherein the Companies' cash and investment securities are held.

- Arranging or causing to be performed, a limited risk management review of the insured's loss exposures but only for the purpose of analyzing and identifying exposures (the "selected exposures") to be underwritten by the Companies.

- Arranging to have insurance policies manuscripted, with Capstone making recommendations (for evaluation and decision by the Client) as to policy premium pricing, the terms and conditions of policy coverages, and the level of coverages, all remaining in the sole control of the Client; and licensing documents (subject to Article V hereof) for use by the Companies.

- Identifying as practical for the Companies' consideration, unrelated (third-party) insurance business.

- Arranging or causing to be performed outside the State of Texas claims' adjustment for the selected exposures.

- Arranging for non-actuarial reviews of the Companies' loss reserves sufficient to meet Delaware's insurance regulatory requirements and the ongoing review of such loss reserves.

- Interfacing with the Companies' regulators, being Delaware Department of Insurance ("Delaware DOI") or the Anguilla Financial Services Commission ("Anguilla FSC").

- Arranging for the required annual audit by an independent CPA firm licensed by the insurance regulators in the Companies' domicile, and, subject to the Companies' ongoing cooperation and timely assistance, maintaining the books and records of the Companies.

- Maintaining the financial records for the Companies based upon information provided by the Companies' management and issuing periodic reports to management based

upon such information.

■ Coordinating annual shareholders' and directors' meetings or written consents in lieu thereof.

■ Preparing or causing to be prepared reports from time-to-time for the Companies and its officers, directors and shareholders covering reserve status, policies written, and the results of the Companies' financial performance.

■ Preparing and filing all regulatory reports in Delaware.

■ Arranging for and assisting in the preparation of drafts of IRS Form 1120-PC or Form 990, as appropriate, for review, edit and signature by a CPA or other tax preparer who is compensated directly for such work by the Companies (and not by Capstone), it being acknowledged by the Companies that the Companies have the ultimate obligation for filing any U.S. tax return or extension thereof.

■ Performing services in coordination with and under the oversight of the Firm and in Capstone's so doing, performing the services specified in Exhibit "A" to the Engagement Letter, further subject to the Sections 4.1 (f) and (n) below. Capstone (with the Firm acting as disbursing agent on behalf of Capstone) will compensate the Firm for its services. The undersigned expressly acknowledge and understand that the Firm represents Capstone as well as the Companies and that as such the signatories hereto waive any conflict that may exist, with each signatory hereto retaining the right to separately retain at its expense separate counsel.

■ Causing to be prepared, in coordination with the Firm, periodic reports and updates on legal, financial, tax and regulatory issues pertaining to captive insurance companies operating in the chosen domicile.

■ Overseeing and conducting the dissolution and orderly liquidation of the Companies as their irrevocably appointed liquidator hereunder under Delaware law.

Except as otherwise provided in this Agreement, all expenses incurred by Capstone in providing services pursuant to this Agreement shall be borne by Capstone.

(b)    **Financial Services.** Capstone shall make available to the Companies' treasury, control and planning services, or the equivalent thereof, to assist the Companies with respect to accounting, risk control, and other financial matters as Capstone determines to be necessary and appropriate. Such services shall include assistance and advice in support of the Companies' CPA's or other financial advisors on bank relations, cash management, financial reporting, accounting, and such other matters as Capstone determines to be necessary; but in no event shall Capstone provide "personal services", or services for "credit", "debt collection", "insurance", "information", "real property", "data processing", and "security", as those terms are defined by statute or regulations for Florida or Texas sales and use tax purposes. Provided, however, as explained further under subparagraph (e) below, Capstone does not serve in a custodial or investment function with regard to the Companies' assets.

(c)    **Tax and Audit.** Subject to the Companies' obligations to provide continuing cooperation as set forth in subpara. (n) below, Capstone shall arrange for, coordinate and pay for the annual independent audit of the Companies' books and reports as part of and contemporaneously with Capstone's work for other clients generally, all as mandated by Delaware DOI. Capstone shall also have responsibility for causing to be prepared and submitted to the Companies for input, assistance and execution all required tax and regulatory filings for the Companies in Delaware. As to all required tax and regulatory filings due elsewhere, principally in the United States, Capstone's responsibility shall only be to arrange for the drafting of such filings, for review and signature by others, with any taxes then due remitted by the Companies from their own funds. Capstone does not and shall not provide as part of this or any other service, professional accounting, tax or legal services, such as, by way of example and not by way of limitation, any legal, tax or regulatory advice. By way of

further example, while Capstone shall be obligated to pay for the financial audit when timely performed as set forth above, Capstone is not the Companies' independent auditor. The Companies' failure to timely fulfill their responsibilities as set forth under subpara. (n) below will result in additional costs and expenses borne by the Companies for both the ongoing work of Capstone and the separate completion of the audit of the Companies distinct from Capstone's other clients.

(d)    **Fiscal Budgeting Matters.**  In addition to arranging for general bookkeeping services throughout the year, Capstone from time-to-time shall assist the Companies in their preparation of their operational budgets.

(e)    **Bookkeeping, Accounting, and Financial Records.**  Capstone shall arrange for the maintenance in Delaware of the bookkeeping records of the Companies and otherwise establish procedures, controls, and systems for the maintenance, and safekeeping of records and books of account reflecting the Companies' operations, all of which shall be prepared and maintained in accordance with appropriate accounting principles accepted by Delaware DOI. However, Capstone does not have and shall not have any control or custody over the nature or type of the Companies' investments or procedures relating to the Companies' cash, securities and other valuables.  Capstone will, however, advise the Companies on the regulatory parameters on the Companies' investments as set forth by Delaware DOI.

Within approximately one hundred seventy (170) days after the end of the calendar year, Capstone shall arrange for the preparation and delivery to the Companies of the Companies' balance sheets and income statements reflecting the financial status as of and for the year then ending, all of which shall be prepared in accordance with appropriate accounting principles accepted by Delaware DOI. Capstone shall also arrange for the preparation and delivery from time-to-time to the Companies of unaudited financial statements to be used for management purposes only, as frequently as reasonably requested in writing by the Companies.

An objective of Capstone is efficiently and responsively providing high quality services in support of the Companies insurance operations.  To meet this objective, Capstone will endeavor to group its requests for information necessary to document loans, support corporate housekeeping functions, support the Companies' insurance operations, etc.; however, to facilitate this goal, the Companies recognizes that it must be timely and responsive in providing information. The Companies recognize that additional costs (including legal fees) as a consequence of the Companies' failure to provide information in a timely fashion will be the responsibility of the Companies pursuant to Section 4.1 (n).

(f)    **Legal.**  Capstone shall coordinate its services to the Companies with the Firm and such additional legal advisors as Capstone or the Firm determines to be necessary.  The Companies may hire whatever additional legal counsel the Companies wish to supplement or replace those of the Firm at the Companies' sole expense and without reduction of the fees due under the Engagement Letter, which are due nonetheless to Capstone. Generally speaking, the legal services being provided by the Firm in coordination with Capstone, for which Capstone compensates the Firm, include the standard legal support services for the day-to-day operation of the companies such as monitoring and responding to regulatory changes, manuscripting insurance policies for licensing by Capstone, drafting standardized line of credit agreements and updating corporate records, along with the other legal services specified in Exhibit "A" to the Engagement Letter. Additionally, Capstone stands ready to compensate the Firm for the legal and tax defense set forth in the Engagement Letter.  However, from time-to-time opportunities or issues may arise outside of the scope of standard legal services provided by the Firm, for which the companies may require legal and/or other professional services.  For example, if the Companies wish to make an investment in other than Delaware Department of Insurance approved securities or a loan secured by collateral other than accounts receivable, equipment, or inventory, the qualification of that investment with Delaware DOI and the documentation of that investment would be outside the scope of the standard legal services provided by the Firm in coordination with Capstone and the Firm's and Capstone's related services shall be separately charged to and borne by the Companies.  Additionally, the Companies at their own expense may request the Firm to supplement such standard legal services by separate arrangements with the Firm.

(g)    **Supplies.**  Capstone shall arrange to obtain and provide all reasonable office supplies, and shall ensure that the Companies' office(s) is at all times adequately stocked with the supplies that are reasonably necessary and appropriate for the operation of their offices and the business therein.

(h)    **Office and Support Services.** Capstone shall arrange for printing, stationery, forms, postage, duplication or photocopying services, and other support services that are reasonably necessary and appropriate for the operation of the Companies' office and the business in the office.

(i)    **Regulatory Licenses and Permits.** Capstone shall use reasonable efforts to arrange for the application and maintenance in the name of the Companies of all U.S. federal and Bahamian or Delaware (as the case may be) regulatory licenses and permits required for and in connection with the operation of the Companies. The Companies understand and acknowledge that they take the regulatory position that the Companies are not subject to state insurance regulations outside the state of the Companies' domicile.

(j)    **Contract Negotiations.** Capstone shall arrange to advise the Companies with respect to and shall arrange to negotiate, either directly or on the Companies' behalf, as Capstone determines to be necessary and appropriate, all contractual arrangements with third parties for the Companies' business, including, without limitation, negotiating agreements with third parties. Agreements on behalf of the Companies shall be entered into as provided for in this Section 4.1.

(k)    **Access.** The Companies shall have the right at all reasonable times during normal business hours to audit, examine, and make copies of its books and accounts maintained by Capstone pursuant to this Agreement. Capstone shall cause to be maintained such financial records for a period of six (6) years.

(l)    **Office Support, Reports, and Records.** Capstone shall arrange to establish, monitor, and maintain appropriate office procedures and policies for the timely creation, preparation, filing and retrieval of all business records in connection with the Companies' business, and of all other proprietary information of the Companies. Capstone shall maintain the confidentiality of all customer records in accordance with all applicable state and federal laws and shall establish written policies and procedures for such. Capstone will cause its third party service providers to also maintain the confidentiality of all customer records.

(m)    **Additional Reports.** Capstone will arrange for the preparation, analysis and filing of any other reports and records as are reasonably necessary for the Companies' business.

(n)    **Companies' Obligation to Furnish Information.** In connection with the accounting, legal and bookkeeping services described above and elsewhere in this Agreement and the Engagement Letter, the Companies hereby undertake to regularly provide to Capstone:

(i) promptly each month and without further follow-up by Capstone, copies of all account information of the Companies (whether such be one or more bank or brokerage account(s) or accounts with other types of financial institutions), including but not limited to copies of all deposits, withdrawals, transfers, and copies of all checks written and cleared, along with an explanation of each such transaction, in order to enable Capstone to timely and accurately maintain the books and records of the Companies and in order to ensure that certain statutory obligations of persons servicing the Companies and/or Capstone are timely met;

(ii) in connection with any authorized line of credit between the Companies and any borrower, Companies shall timely deliver copies of the fully executed loan documents (as well as any applicable amendments and modifications) and cause all borrowers to timely prepare and deliver to Capstone needed advance requests, borrowing base reports, and other periodic reports and information in connection with such loan as well as any other information required by Delaware DOI or by the Companies' resident insurance manager, registered agent or independent auditors; and

(iii) in connection with third party risk management consultants and annual auditors, updated financial statements, tax returns, and conventional insurance policies and related underwriting documents.

Should Capstone not regularly receive such information to enable it to efficiently and timely perform its functions, then Capstone may charge additional fees to the Companies (i) to compensate Capstone in identifying, locating, obtaining or creating information reasonably needed by Capstone in the performance of its obligations hereunder or (ii) in paying third party consultants or the Firm for their additional fees due to the

Companies' delay.

   **Notwithstanding anything to the contrary contained in this Agreement, in no event shall Administrative Services include "personal services", "credit reporting services", "debt collection services", "insurance services", "information services", "real property services", "data processing services", "security services", or any other "taxable services" as those terms are defined by statute or regulations for Florida or Texas sales and use tax purposes. Furthermore, since it is not a law firm or a CPA firm, under no circumstances will Capstone itself provide any legal or CPA services.**

   **4.2     Service Providers.**   In performing their obligations under this Agreement, the Companies acknowledge that Capstone will be retaining at Capstone's expense the services of third party service providers, all as and to the extent Capstone deems reasonable and appropriate.

   **4.3     Personnel.**   Except as specifically provided in this Agreement, Capstone from time-to-time shall retain at its expense and shall be responsible for training, supervising, and terminating administrative and other nonprofessional personnel for the benefit of the Companies as Capstone deems reasonably necessary and appropriate for Capstone's performance of its duties and obligations under this Agreement.  Capstone shall have sole responsibility for determining salaries and providing fringe benefits for personnel and for remunerating independent contractors, and for withholding income tax, unemployment insurance, social security, or any other withholding or filing information reports, as required by all applicable laws.  Capstone shall appropriately prepare, maintain, and file all requisite reports and statements regarding income tax withholdings, unemployment insurance, social security, workers' compensation, equal employment opportunity, or other reports and statements required with respect to personnel employed or retained by Capstone and provided to the Companies pursuant to this Agreement.

   **4.4     Place of Assistance.**   Administrative Services to be rendered pursuant to this Agreement may be performed for the Companies in Florida, Delaware, or Anguilla or at other locations, including Texas where Capstone Associated Services, Ltd., a Texas limited partnership, a subsidiary of Capstone is located.

   **4.5     Time to be Devoted to Contractual Duties.**   Capstone shall devote reasonable efforts to the discharge of its duties hereunder as appropriate.

   **4.6     Term of Assistance.**   Capstone's Administrative Services to the Companies due under this Agreement and in connection with the Engagement Letter shall commence on the effective date first above written being December 31, 2015 and shall continue for a term of five (5) plus years ending August 31, 2021, with such term being automatically renewed for successive three (3) year periods ("Successive Terms") beginning on each successive third (3rd) anniversary date thereafter until terminated by the Companies or by Capstone by either party giving written notice of termination of services in accordance with the provisions of this Section 4.6. Given Capstone's need to commit its personnel to the Companies' operations and because of Capstone's commitments to service providers in Delaware and elsewhere so as to economically provide services under this Agreement, coupled with the need to allow time for an orderly liquidation of the Companies as required by the regulatory authorities of the Companies' domicile, settlement of claims, withdrawal from the pooling agreement, etc., substantial advance notice is necessary to terminate this Agreement (and the services due hereunder) and the Engagement Letter.  If the Companies wish to terminate services at the end of the initial three plus year term, written notice of termination must be received by Capstone on or before December 31, 2019 (as further specified in the Engagement Letter) with the requirement that all fees due Capstone or the Firm be current as of such date of notice for such notice to be effective. If terminated by the Companies in this fashion, no further payments will be due for work done after the end of the initial contract terms, being after August 31, 2021, at which point Capstone's services (including access to any pooling arrangement and third party insurance) will cease and Capstone's (and PoolRe's) obligations under this Agreement will terminate.  If *not* terminated in this fashion, i.e., by advance written notice being given on or before December 31, 2019 (as further specified in the Engagement Letter), this Agreement will automatically renew for a three year term under the same financial arrangements, the first such renewal period being September 1, 2021 - August 31, 2024; furthermore, every three (3) years thereafter this Agreement will automatically renew unless terminated by the Companies or by Capstone by giving written notice of termination at least twenty months prior to any third anniversary date (i.e. by December 31, 2019 for the first automatic renewal), in which case the services portion of this Agreement shall terminate as of such third (3rd) anniversary

date, so as to always provide Capstone at least twenty months advance notice of any change in the Parties' relationship. Provided, however, anything to the contrary in any agreement notwithstanding, under no circumstances shall the Year End Termination Date be prior to August 31, 2021.

As used herein, the term "Year End Termination Date" means August 31, 2021 for the initial term of this Agreement and for each Successive Term, the last day of each such Successive Term.

Upon the termination of this Agreement for any reason whatsoever, Capstone shall have the obligation (for no additional fees due it) and the right to arrange for and cause the dissolution and liquidation of the Companies under U.S. and domicile law, with such dissolution effective on or about the Year End Termination Date. In order to effect such dissolution and liquidation, the undersigned, comprising all of the owners of the Companies, hereby agree to cause and to continue to cause the Companies' owners to revoke all inconsistent proxies and hereby grant to and appoint Capstone's Chief Executive Officer and/or any Vice President an exclusive proxy to vote and represent all of the Companies' outstanding stock and equity as follows: (i) to call an election of and to elect the Companies' board of directors for the purposes of presenting and approving a Plan of Liquidation calling for the liquidation of the Companies on or about the Year End Termination Date; (ii) to vote the Companies' stock in favor of such Plan of Liquidation; and (iii) to vote on and take such other actions as Capstone deems appropriate or necessary to facilitate the dissolution and liquidation of the Companies as of the Year End Termination Date. This proxy, which is irrevocable and coupled with an interest, is granted in part to ensure that no insurance companies continue its corporate existence without comprehensive professional management, which otherwise creates a burden on the domicile's regulators (and reflects on Capstone) and further ensures that the Companies comply with applicable U.S. laws. Additionally, this provision is in place in connection with the ongoing tax obligations of the Firm to provide ongoing tax controversy support as outlined in the Engagement Letter.

All fees under the Engagement Letter, as amended from time-to-time, shall be due and payable to Capstone through the later to occur of the dissolution of the Companies or the Year End Termination Date.

Notwithstanding anything to the contrary, in the event that the Companies default in its obligations to pay its invoices to Capstone or breaches Companies' agreement under this Agreement and the Engagement Letter, and such defaults are continuing for one hundred twenty (120) days after Capstone's written notice to the Companies, Capstone at its option may terminate or suspend its obligations in whole or part under this Agreement or the Engagement Letter and pursue any other remedies available to it.

**4.7    Services Fee.** In consideration of services to be provided by Capstone to the Companies under this Article, the Companies and/or the Client agree to pay Capstone a fee in accordance with and on a time schedule as agreed to from time-to-time between Capstone and the Client in the aforementioned Engagement Letter, as amended in writing from time-to-time.

**4.8    Relationship of Parties.** Nothing in this Article shall be construed as (a) the guarantee by Capstone of the success of the Companies' insurance or investment activities; (b) an assumption by Capstone of any financial obligation of the Companies; (c) the creation of any employment relationship between (x) the Companies and (y) employees or consultants of Capstone and its affiliated entities; (d) an assumption by Capstone of any responsibility for the work performed by outside suppliers or consultants employed by the Companies, except where such work is performed at the suggestion or recommendation of Capstone; or (e) the delegation of any managerial authority over the Companies to Capstone. The Companies acknowledge that Capstone will make recommendations and offer advice pursuant to this Agreement but that all decisions with respect thereto shall remain those of the Companies' officers and directors.

## ARTICLE V
## INFORMATION DISCLOSURE AND LICENSE

**5.1    Intellectual Property.** The Client and the Companies acknowledge that they have received or will be receiving Intellectual Property from Capstone that is confidential, proprietary, copyrighted or kept as a trade secret in connection with the receipt of services provided under this Agreement and through its ongoing relationship with Capstone including the value and advantage of special information and expert knowledge

about, and expertise in captive insurance services. Such "Intellectual Property" means any confidential, proprietary, copyrighted, trademarked, or trade secret information provided by Capstone. Such information includes, but is not limited to the value and advantage of special information and expert knowledge about, and expertise in captive insurance services, and Documents as described herein. Additionally, such confidential information includes, but is not limited to Documents, such "Document(s)" being of any item, whether written or oral, tangible or intangible, prepared by or at the direction of Capstone for the Companies, including but not limited to insurance policies, insurance contracts, insurance coverage agreements, reinsurance agreements, treaties, and loan agreements, additionally including any other item, document, agreement, or any form of expression made by Capstone at any time before, during or after the term of this Agreement if the person receiving such expression is notified by Capstone or one of its Affiliates, either orally or in writing, that such expression is confidential, secret, or the Intellectual Property of Capstone. Provided, however, as used in this Article V, the terms "confidential", "proprietary," "exclusive" or "trade secret" do not apply to those specific portions of any Documents or materials provided by Capstone, its Affiliates or the Firm in connection with this Agreement or the Engagement Letter that address tax treatment for or tax structure of the Client, it being the express intention of the Parties and the Firm to not create a "Reportable Transaction" under Section 1.6011-4 of the United States Treasury Regulations.

Further, the Client and the Companies hereby acknowledge that the Intellectual Property provided is considerably valuable in nature, was created, produced, and developed by Capstone at great expense, and the dissemination, replication or theft of such information will cause Capstone a considerable amount of monetary damages. Further, due to the confidential nature of the Intellectual Property provided through receipt of Capstone's services, the Client hereby enters into the following limited license as described below.

**5.2    Grant of a Limited License to Use.** Capstone hereby grants a limited, non-exclusive, non-transferable by any Party other than Capstone, non-assignable by any Party other than Capstone, license to "Use" the Intellectual Property received from Capstone by the Client for the full duration of the Parties' rolling three year terms as described in Section 4.6 of this Agreement and such rights and duties described herein are fully enforceable against the Client, their Affiliates, or others who later become bound by this Agreement or Article V even beyond the termination of this Agreement until every right, duty and obligation is fully satisfied by each Client, their respective Affiliates, or those other who later become bound by this Agreement or Article V. "Use" is defined to mean, for the purposes of Article V, the right for the Companies to use Intellectual Property delivered by Capstone or the Firm in connection with the operation of the Companies during the term of the Engagement Letter. Such Use grants the Client only the ability to receive, read, and make decisions concerning insurance operations under this Agreement and the Engagement Letter based on the Intellectual Property provided hereunder. Use does not include a right to copy, distribute, forward, share, sell, or assign. Use by Client does not extend beyond the Companies and actual parties to the Documents without the express prior written consent from Capstone as described below. Use does not constitute a granting of ownership, interest in, or right to the Intellectual Property. Capstone, at all times prior to, during, and after the expiration of this Agreement and Article V, remains sole owner of all Intellectual Property prepared by or at the direction of Capstone for the Companies, including any Intellectual Property created prior to, during, and after this Agreement terminates.

**5.3    Ownership Retained by Capstone.** The Parties hereby acknowledge that all Documents and Intellectual Property shall remain the sole property of Capstone. Upon the termination of this Agreement, either by mutual termination by the parties, the formation of a dispute, the failure to pay for the services Capstone provides, leading to the expiration of the Term of Assistance as set forth in Section 4.6, the end of services being provided by Capstone under this Agreement, or for any reason whatsoever, the Client, the Companies, and their Affiliates, including any person who has received any Document or Intellectual Property as described herein or been granted an extension of the right to Use, must immediately return all Documents and Intellectual Property to Capstone or destroy the Documents or Intellectual Property and provide written, verified, and sworn proof of said destruction within five (5) business days to Capstone. Failure to either return or destroy all Intellectual Property or Documents, with proof thereof, as described herein shall constitute a material breach of this Agreement. Except as expressly provided in this Article V, no rights, licenses, trademarks, inventions, copyrights, patents or other intellectual property rights are implied, transferred or granted from Capstone to the Client or any other Party by execution of this Agreement or by delivery of the Intellectual Property or Documents to the Client or any other Party. The obligations of the Parties under this Article V shall survive termination of this Agreement for whatever reason.

     **5.4**   **Right to Use.** This limited license conveys only a right to Use, as described above, to the Companies and does not extend to any other person or entity beyond the Client except as granted as described in the following section.

     **5.5**   **Requests for Extensions of the Right to Use.** Should the Client require additional assistance in reviewing Documents or Intellectual Property under this Agreement by a third party advisor or consultant, the Client must make a written request to Capstone by United States Postal Service mail with a return receipt or by emailing both the President and General Counsel of Capstone, whereupon Capstone, in its sole discretion, will determine if such right to Use may be extended to the person named in the Client's request. Capstone shall attempt to respond to each request from a Client within a reasonable time, such being at least twenty (20) business days. However, if Capstone fails to respond to such request, Capstone's failure to respond shall be deemed a denial of the request and shall never constitute a grant of the right to Use to any other person or entity. Failure to request an extension of the right to Use and receipt of Capstone's required granting thereof, prior to the Client delivering, conveying, forwarding, or in any other way showing another person or entity the Intellectual Property, shall constitute a material breach. If Capstone allows a third party request for Use of the Intellectual Property or Documents, they must sign an agreement in form an substance acceptable to Capstone concerning the access to such Intellectual Property or Documents.

## ARTICLE VI
## MISCELLANEOUS

     **6.1**   **Effect of This Agreement.** Subject to the Engagement Letter having precedence as to any conflicts, the Parties hereto stipulate and agree that this Agreement amends the Engagement Letter (including its attachments and prior amendments) and agree to be bound by the terms and provisions of this Agreement as if incorporated into the Engagement Letter. To the extent of any conflict between the terms and provisions of this Agreement and the Engagement Letter, the Engagement Letter controls.

     **6.2**   **Waiver of Compliance; Consents.** Any failure of a party to comply with any obligation, covenant, agreement, or condition herein may be waived by the other party; provided, however, that any such waiver may be made only by a written instrument signed by the party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement, or condition shall not operate as aw aiver of, or estoppel with respect to, any subsequent or other failure. Whenever this Agreement requires or permits consent by or on behalf of any party hereto, such consent shall be given in writing in a manner consistent with the requirements for a waiver of compliance as set worth in this section, with appropriate notice in accordance with section 6.6 of this Agreement.

     **6.3**   **Assignment.** This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. This Agreement may not be assigned in whole or in part by any Party except with the prior written consent of all Parties hereto; provided, however, the Parties hereto acknowledge that Capstone will be retaining various third parties to assist in the performance of its services hereunder. Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon any person other than the parties, any successors and permitted assigns, any rights, remedy, or claim under or by reason of this Agreement or any provisions herein contained.

     **6.4**   **Severability; Governing Law; Dispute Resolution.** The covenants set forth in this Section of this Capstone Services Agreement are independent and severable from every other provision of this Agreement. If any one or more provisions contained in this Article shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect, such invalidity, or unenforceability shall not affect any other provision of this Article, but this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. For purposes of any disputes arising under this Agreement, the sole venue and jurisdiction for resolution of such disputes shall be in Houston, Texas. The arbitration provisions of the Engagement Letter with Capstone and The Feldman Law Firm LLP are incorporated herein for all purposes.

     **6.5**   **Counterparts.** This Agreement may be executed in two or more counterparts in original form

or by fax, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

      6.6    **Notices.** Any notice, demand, request or other communication required or permitted under this Agreement shall be in writing and shall be deemed to have been given upon delivery, if hand delivered, and upon mailing, if mailed by U. S. mail, registered or certified, return receipt requested, adequate postage prepaid, to the following address, unless the parties are subsequently notified of any change of address as shall be specified by like notice:

*If to the Companies:*

Janus Casualty Corp.
Orion Casualty Corp.
Cerberus Casualty Corp.
c/o Capstone Insurance Management, Ltd.
2207 Concord Pike, Suite 585
Wilmington, Delaware 19803-2908

*With a copy to:*

St. Charles Surgical Hospital
att: Dr. Scott K. Sullivan and
Dr. Frank J. DellaCroce
1717 St. Charles Avenue
New Orleans, LA 70130

*With a copy to:*

David Kushner, CPA
Kushner LaGraize
David Kushner
3330 W. Esplanade Ave. S, Suite 100
Metairie, LA 70002

*With a copy to:*

David R. Sherman
Chehardy Sherman L.L.P.
One Galleria Blvd., Suite 1100
Metairie, LA 70001

*If to Capstone:*

Capstone Associated Services (Wyoming), Limited Partnership
att: President
6725 Woodbridge Drive
Boca Raton, FL 33434
Fax: 561/208-1458

with a copy to:

Capstone Associated Services, Ltd.
att: President
1980 Post Oak Blvd., Suite 1950
Houston, TX 77056
Fax: 713/623-0329

*With a copy to:*

Capstone Associated Services, Ltd.
att: Michael T. Kelly
1980 Post Oak Blvd., Suite 1950
Houston, TX 77056
Fax: 713/850-8530

*with a copy in all instances to:*
THE FELDMAN LAW FIRM LLP
att: Stewart A. Feldman
Two Post Oak Central
1980 Post Oak Blvd., Suite 1900
Houston, TX 77056-3877
Fax: 713/850-8530

      6.7    **Headings.** The article and section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

      6.8    **Entire Agreement.** This Agreement, including the exhibits, schedules, and other documents and instruments referred to herein, together with the Engagement Letter, embodies the entire agreement and understanding of the Parties hereto in respect of the subject matter contained herein. With respect to the subject matter of this Agreement, this Agreement supersedes all prior agreements and understandings between the parties.

**6.9    Amendment and Modification.** This Agreement may be amended, modified, or supplemented only by written agreement executed by the parties hereto with specific, written reference to this Agreement. Except as set forth in the preceding, no part of this Agreement may be excluded, waived, objected to, modified or superseded by any contemporaneous or subsequent written or oral agreement by and between the Parties. The Parties hereby agree that should any provision of this Agreement be declared or be determined by any court, arbitrator, or tribunal to be illegal or invalid, the validity of the remaining parts, terms or provisions shall not be affected thereby and said illegal or invalid part, term or provision shall be deemed not be a part of this Agreement. The Parties mutually agree that this Agreement shall not be construed against any Party as the author or drafter thereof and hereby waive all defenses to such.

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Agreement effective as of the day and year first above written.

**"CLIENT"**

Dr. Scott K. Sullivan individually and as: (i) authorized signatory as an owner, either directly or through a holding company, of Cerberus Casualty Corp.; Janus Casualty Corp.; and Orion Casualty Corp. (or the existing Bahamian cells) and (ii) authorized signatory for St. Charles Surgical Hospital including all respective Affiliates

Dr. Frank J. DellaCroce individually and as: (i) authorized signatory as an owner, either directly or through a holding company, of Cerberus Casualty Corp.; Janus Casualty Corp.; and Orion Casualty Corp. (or the existing Bahamian cells) and (ii) authorized signatory for St. Charles Surgical Hospital including all respective Affiliates

**"CAPSTONE"**

CAPSTONE ASSOCIATED SERVICES (WYOMING), LIMITED PARTNERSHIP, a Wyoming limited partnership

By: Capstone Associated Services, LLC, a Wyoming limited liability company, its General Partner

By:
Authorized Representative

The Feldman Law Firm LLP joins in the execution of this Agreement for the limited purposes of agreeing to certain rights and responsibilities with respect to Section 4.6 and Article V.

THE FELDMAN LAW FIRM LLP

By:
Stewart A. Feldman, Partner

## Exhibit C
### TAX RISKS AND RESPONSIBILITIES UNDER IRC §831(b)

Tax and business planning, even without the overlay of alternative risk management planning, has its own inherent risks. This planning, as other types of business and tax planning, involves inherent risks and should only be undertaken by those who can identify and evaluate such risks and understand and accept them.

The intention is to structure and operate the captive insurer so as to qualify for partial tax exempt status as a small non-life (casualty) insurance company under Internal Revenue Code (IRC) §831(b) wherein underwriting income is exempt (but investment income is fully taxable as in any other C corporation) from U.S. income taxes, provided, among other criteria, that annual premium revenue is limited to no more than $1,200,000. To summarize on a non-exhaustive basis, the risks include that the Internal Revenue Service ("IRS" or the "Service") will challenge the tax deductibility of the insurance premiums paid by the insureds and also disallow the tax exempt status of the captive and assess back taxes, interest and penalties. The tax deductibility of the insurance premiums and tax exempt status of the captive insurer is an issue of fact that turns on, among other issues: (i) whether the captive is in fact acting as an "insurance company" (see discussion below); and (ii) whether or not the coverage provided by the captive is truly an act of insuring a risk (and not merely an act of reserving for a risk). The final determination of these issues could ultimately depend on an assessment of all the relevant facts and circumstances by a court. Tax exempt status, of course, does not extend to the captive's liquidation or sale although tax planning to minimize such tax effect does exist in this regard as well.

There are a number of court cases and IRS rulings that have dealt with these issues which can be distilled down to an inquiry in the following three areas:

(i) Having a corporate structure wherein the captive insures the risks of brother-sister entities, and not the risks of persons higher in the ownership chain (including parent-owners), in order to satisfy the criterion that there must be "risk-shifting" for insurance to exist. The Service has argued that there is no risk shifting where a parent or any entity higher in the direct chain of ownership is paid money on a claim, since the payment for a claim that the parent receives from the captive is offset on the parent's books by a reduction in the value of the captive subsidiary on the parent's books. For this reason, we recommend that a person other than the primary insured, that also is higher in the chain of ownership than the insured, be the owner of your captive insurer so as to create a brother-sister relationship between the captive and the insured, and thereby assist in achieving risk-shifting.

(ii) Having a certain percentage of unrelated (third-party) insurance business in order to satisfy the criterion that there be "risk distribution" for insurance to exist. Opinions as to the minimum outside business required varies from 0% to 50%, and should decrease in the instances of the structure described in subparagraph (i) immediately above. The Service has previously advised that 50% outside business is sufficient, but that 10% is not. Based on our research and experience in obtaining rulings from the Service in this area, we advise at least 30% in unrelated insurance business (measured in terms of premium dollars) with unrelated business being recommended at the 50% level. Under the Firm's supervision, Capstone will be responsible for attempting to make available the third party insurance at this level for your evaluation and consideration for possible underwriting to the extent that you concur with our recommendation. However, there are no guaranties being offered that this third party underwriting will be available to your captive insurer or the exposures and risks related thereto.

In this regard, the Service released Rev. Rul. 2005-40 which concerns a single insured and an insurer insuring only that insured. Although the arrangement may shift the risks to the insurer, the Service concluded in this revenue ruling that those risks are not, in turn, sufficiently distributed among other insureds or policyholders. Therefore, such arrangement did not constitute insurance for federal income tax purposes. As an aside, we note that the Service's example of non-compliant planning is more aggressive than that typically undertaken for the Firm's clients.

THE FELDMAN LAW FIRM LLP

Additionally, the Service stated in Rev. Rul. 2005-40 that to be an insurable risk the transferred risk must contemplate "the fortuitous occurrence of a stated contingency," and must "not be merely an investment or business risk." This was consistent with prior case law. However, a broader and more favorable pro-taxpayer view was adopted in September 2015 by the U.S. Tax Court in R.V.I. Guaranty Co., Ltd. In that case, the court held that the taxpayer, which issued residual value insurance contracts, was an insurance company for federal income tax purposes. This decision of the U.S. Tax Court is contrary to the position taken by the IRS in administrative rulings and published materials stating that the risks involved in residual value insurance was an "investment risk" and not an insurable risk. The distinction of insurance risk versus investment or business risk in light of the R.V.I. decision and its application to captive insurance companies is unclear. If it is determined that a policy is not for "insurance," the captive's status as an insurance company could be in jeopardy if such determination caused the captive's investment income to exceed its underwriting income for the year.

The IRS has also ruled that risk distribution incorporates the statistical phenomenon known as the law of large numbers. In prior years, there was no case law or other tax authority that illustrated the application of this principle; however, in 2014 the U.S. Tax Court ruled in favor of two captive insurance arrangements (discussed below) based upon risk distribution through discrete risks rather than number of insureds. Distributing risk allows the insurer to reduce the possibility that a single costly claim will exceed the amount taken in as premiums and set aside for the payment of such a claim. By assuming numerous relatively small, independent risks that occur randomly over time, the insurer smooths out losses to match more closely its receipt of premiums.

In 2014, the U.S. Tax Court again ruled in favor of the taxpayers in the Securitas and Rent-A-Center, Inc. cases. In each case, the taxpayer had formed a captive insurance company to insure its operations. The IRS claimed, among other things, that the insurance arrangement lacked risk distribution. The primary argument advanced by the IRS in these cases was that the risk was too heavily concentrated in one insured. The U.S. Tax Court held in both cases that risk distribution had been achieved due to the large number of independent risks that the captives insured. In Rent-A-Center, the court noted the existence of thousands of stores and trucks in addition to tens of thousands of employees insured by the captive insurance program, in concluding that the captive insured a sufficient number of statistically independent risks. Likewise, in Securitas, the court noted that the captive was exposed to a large pool of statistically independent risk exposures in ruling that risk distribution had been achieved by the captive without unrelated insurance underwriting.

It remains unclear what minimum number of risks are required to meet the law of large numbers. Further, it is unclear whether meeting these criteria is indispensable to achieve the requisite level of risk diversification for closely-held captive insurance companies. Nevertheless, through the PoolRe risk pool – should you decide to participate in such and should the pool accept your participation – our clients cross insure 500+ distinct companies on over 800 distinct policies in order to achieve a measure of risk diversification on that segment of the captive's exposures.

(iii) Having a legitimate business purpose for forming and operating the captive insurer beyond that of merely gaining a tax benefit in order to satisfy the criterion that the business structure and the transactions connected to it not be a mere sham designed solely to gain tax advantages.

Another possible area of IRS challenge concerns the capitalization of the captive. While most captives are capitalized with the statutory minimum capital in the form of cash, the Service could make the argument that the captive is too thinly capitalized, notwithstanding its having met the domicile's statutory minimum capitalization requirement. Notwithstanding such, we have never seen the Service make this argument where the capitalization complies with that of a recognized insurance domicile.

THE FELDMAN LAW FIRM LLP

Additionally, the IRS imposes a 4% excise tax under IRC §4371 on premiums paid by U.S. persons which will be assessed if the captive is domiciled outside the U.S. and has not made an election to be taxed as a domestic corporation. Such election, if made, must be approved by the IRS and maintained by the captive. A closing agreement with the IRS is required if the captive does not maintain a "U.S. office" with a minimum percentage of its assets in the U.S. However, if this requirement were not met, there would likely be required a letter of credit placed with the IRS as a condition to this election.[1]

In December 2002, the Service issued Rev. Proc. 2002-75 stating that the Service will consider ruling requests regarding the proper tax treatment of a captive insurance company generally. The practical import of this advance ruling procedure remains unclear. Because the filing fee due the IRS is alone generally at least $6,000, in addition to the uncertainty as to the Service actually ruling, this planning is based on no ruling request being made. Nonetheless, under an election allowed pursuant to IRC section 831 (b), provided that the entity is properly operated, tax exempt status exists in the case of underwriting profits. Further, in order to meet the partial tax exempt provisions of IRC §831 (b), the captive must be operated in a manner consistent with relevant provisions of the Internal Revenue Code. Such exempt status, of course, does not extend to the captive's liquidation or sale, which generally results in a long term capital gain tax being assessed on the gain as well as, in the case of a liquidation, an income tax internal to the captive on its appreciated assets.

In the event that a determination is made that the captive is not an "insurance company," it would not be entitled to the benefits of IRC §831(b), with the resulting flow of adverse consequences. The term "insurance company" generally means any company more than half of the business of which during the taxable year is the issuing of insurance or annuity contracts or the reinsuring of risks underwritten by insurance companies. Whether more than half of the business activity is related to the issuing of insurance or annuity contracts will depend on facts and circumstances. Factors to be considered in evaluating this "more than half of the business" test may include the relative distribution of the number of employees assigned to, the amount of space allocated to, and the net income derived from, the various business activities. A company whose investment activities "outweigh" its insurance activities is not considered to be an insurance company for this purpose. Additionally, the captive needs to conduct its business, including its investment activities, like an insurance company. In this regard, while the Service has not yet addressed the issue of secured loans, tax practitioners differ in their opinion on the prudent level, but they generally agree that secured loans must be on a commercial and arm's length basis and that the higher the relative amount of secured loans, the less the captive looks like an insurance company. Nonetheless, some tax practitioners believe that a higher percentage of secured loans may be supported by their being well secured and profitable and therefore prudent investments of the captive.

If a foreign domiciled captive is determined not to be an insurance company for tax purposes, any election made under IRC §953(d) to domesticate the foreign company for U.S. tax purposes is invalid and the captive may be treated as a controlled foreign corporation as defined in IRC §957, from which still other adverse consequences flow.

---

[1] The letter of credit secures the IRS for payment of the 4% excise tax in the event that the tax exempt election, following its grant by the Service, is later determined to be invalid. To be clear, the §953(d) election, which has the effect of making the foreign domiciled captive a domestic corporation for federal tax purposes, may require an ongoing $75,000 letter of credit (calculated annually as 10% of the captive's total revenue, with a $75,000 minimum) with the IRS as the beneficiary, to guaranty the payment of federal taxes should such ever be assessed; although, as set forth herein, this requirement should be avoided through the maintenance of a U.S. office with sufficient U.S. assets.

THE FELDMAN LAW FIRM LLP

In addition to the above risks, there are legislative and regulatory risks that could change or reduce or eliminate the benefits under IRC §831 (b). To this end, the IRS issued final regulations in 2003 requiring tax return disclosure of transactions involving tax shelters. While we believe (and our peers in the captive industry appear to agree) that the captive planning described herein and in the related engagement letter is not a "tax shelter," as defined by the regulations, the area is very technical and others may reach a different conclusion. To be sure, the Service has been active with pronouncements in this area which are available for your review in complete form at www.CapstoneAssociiated.com. Because we are not your tax return preparer, the final decision of whether to separately disclose this transaction is between you and your tax return preparer. Our view is that this disclosure is not required by the Service's pronouncements.

In February 2015, the IRS added abusive captive insurance arrangements to its annual list of tax scams known as the "Dirty Dozen" for the 2015 filing season. The IRS stated that an otherwise legitimate tax structure involving small or "micro" captives was subject to abuse by unscrupulous promoters. The result of this IRS announcement will most likely be a notable increase in IRS scrutiny and audits of captive insurance companies and their captive managers, whether such arrangements are legitimate or abusive.

The timing of the planning in the initial year may be an issue. No doubt undertaking the planning earlier in a calendar year is preferable to an end of the year formed insurer, although we have identified no specific case law or regulations on point. However, the contracts entered into each year by the insured with the insurer must be "insurance policies" appropriately priced. In this regard, a year-end formed captive presents particular issues.

At the state level, the State of Texas as well as other states assesses a premium tax on an insured for risks borne in such state(s) by a non-admitted carrier even where the coverage is independently procured outside of such state(s). For example, under §1.14-1 of the Texas Insurance Code, the amount of this tax is 4.85% of the premiums paid on insurance contracts that are independently procured and attributable to Texas risks.

The following discussion addresses Texas risk, but is equally applicable to the state of your operations. We will act on behalf of the insureds and the captive to independently procure all coverages outside of Texas, but these non-Texas acts may still subject your operating entities to the Texas independently procured premium ("IPP") tax. We recommend that your operating entity (that is, the insured) file and pay tax on the premiums on "Texas risks" covered by the independently procured policies, which could amount to several thousand dollars per year. Such recommendation is notwithstanding the uncertain basis for imposing and collecting this tax under the Todd Shipyard case decided by the U.S. Supreme Court in 1962 (suggesting that the IPP tax may not be constitutional in the absence of minimum contacts with a state). See also (i) Dow, decided in 2001, which, following Todd Shipyard, declared unconstitutional the IPP tax as such applies to Dow Chemical; and (ii) STNP where in 2006, an Austin trial court ruled in a summary judgment that the state's IPP tax is invalid as it violates the McCarran Ferguson Act. However, please note that the Third Court of Appeals in Austin reversed the trial court's decision in 2007, and the Texas Supreme Court subsequently denied taxpayer's petition for review. STNP operates the South Texas Nuclear Power Project, a major utility-owned electrical generating facility. The full version of these cases are available at the web address provided above. Although we will take responsibility for assisting your CPA in completing the filings based on the information you provide us, our fees exclude, in all cases, taxes and other amounts due the IRS and other taxing authorities.

More recently, the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act included a provision giving the home state of the insureds the exclusive right to collect premium taxes on non-admitted insurance. The impact of such provision on captive insurance arrangements is unclear and is

THE FELDMAN LAW FIRM LLP

currently the subject of debate by commentators. See www.feldlaw.com/articles.html under "Nonadmitted and Reinsurance Reform Act."

The stated intent of the relevant portion of the Dodd-Frank Act was to unify premium tax reporting on surplus lines insurance; that is, the use of licensed brokers to place certain lines of insurance with approved but unlicensed insurance companies. However, certain states have taken the position that the exclusive authority to tax premiums on all types of independently procured insurance was granted to them under the Dodd-Frank Act when implementing their respective changes to surplus lines insurance tax law.

While not a tax risk per se, most of the Firm's and Capstone's clients are looking for bundled or turnkey services from a reputable law firm with the depth and experience to handle the corporate, tax and potential tax controversy work and from a fullly staffed captive administration, management and insurance based group. Capstone and the Firm offer clients unbundled services, if they wish, recognizing that doing such interjects a wide range of operational risks that the Firm and Capstone believe that this joint undertaking minimizes.

Finally, on April 10, 2004, President Bush signed the Pension Funding Equity Act of 2004 (Public Law No. 108-218). Under both the new law and the prior law, an "insurance company," other than a life insurance company, qualifies as an IRC §831(b) company if (a) its net written premiums (or, if greater, direct written premiums) for the taxable year do not exceed $1,200,000 (when aggregated with such amounts received in the taxable year by all other companies in the same controlled group), and (b) the company elects to be taxed under IRC §831 (b). Once an IRC §831 (b) election is made, it basically becomes irrevocable if the captive continues to operate as an intermediate size captive. Under the new law, the $350,000 floor for net written premiums (or, if greater, direct written premiums) which existed under prior law is removed. Under prior law, an IRC §831(b) company would automatically revert by operation of law to a IRC §501(c)(15) company if premiums fell below $350,000 in any given year. Still, under the new law, if an IRC §831(b) insurance company meets the requirements of both IRC §831(b) and IRC §501(c)(15), it is not clear whether the company continues as an IRC §831(b) company or reverts to an IRC §501(c)(15) company. In this regard, the Service has indicated informally that where both provisions apply, that IRC §501(c)(15) trumps IRC §831(b) with the result that the captive is wholly tax exempt.

## Summary of The Feldman Law Firm LLP's IRS Experience With Capstone-Administered Captive/Alternative Risk Planning

The provisions of the Internal Revenue Code (the "Code") providing favorable treatment of small insurance companies have been traced by the Firm back prior to 1920. Of course, during this period of time, the tax provisions for small captives have changed on multiple occasions. For example, the Revenue Act of 1913 provided for small mutual insurance companies as being tax exempt up to $75,000 in insurance premiums ($1.8 million in 2015 dollars) under the ancestral provision of Code section 501(c)(15). To be sure, recently proposed legislation for section 831(b) insurance companies would nearly double the maximum premium revenue to $2.2 million per year, with further indexing for inflation. Whether this proposed legislation ultimately will pass is unclear. Over the years, some changes in legislation have expanded the use of these provisions; others have restricted the flexibility of the planning.

Our experience discussed below centers on property & casualty insurance companies operating under Code sections 501 (c)(15), 831 (b) and 831(a). Capstone operates the former two Code-based captives in a similar manner such that the tax issues should be the same. The following summarizes our tax experience with IRS reviews of the planning in some form since the formation of our first captive in 1998. We've now surpassed 175 formations in which the Firm was the lead counsel and where Capstone has operated the captives. This is exclusive of other projects in which either Capstone or our Firm were involved as advisors.

THE FELDMAN LAW FIRM LLP

A. Thirty-nine (39) favorable rulings by the IRS which issued favorable Form 1024 tax exemption determination letters after exhaustive submissions to the Service. Each of these submissions comprised hundreds of pages of documents, such prepared by the Firm on behalf of clients, with significant input from Capstone. These captives were originally all section 501(c)(15) captives, most of which (to the extent still in operation) now have migrated to operate under Code section 831(b), although some of which continue to operate under Code section 501(c)(15). As originally filed, this planning was based upon the Harper decision in which 30% outside (unaffiliated) business was considered sufficient for risk distribution. Beginning in 2012, because of the Service's then unexplained actions of its tax exempt division regarding section 501(c)(15) captives, the Firm recommended and Capstone made available a 50% outside (unaffiliated) business program in an effort to meet the 50% safe harbor test set forth in Rev. Rul. 2002-89. We have since continued this enhanced risk sharing program. The 50% pool is available to both section 501(c)(15) and 831(b) captives.

These tax exemption determination letters were obtained usually in each instance after extensive follow-up inquiry by the Service (often multiple inquiries) and review of the responses before the Service issued its affirmative tax exempt rulings.

B. Twelve (12) audits of captives where the Service examined a broad range of issues at length. These were all section 501(c)(15) captives under audit. Except for one of the audits described in Section C. below, these audits were closed out at the audit level. Each case was closed with no change in tax due and no interest or penalties due.

C. Three statutory notices of deficiency (known as "90-day" letters) issued by the Service that resulted in filed tax court petitions jointly prepared by the Firm and other counsel hired and paid for by the Firm. Two of the tax court petitions followed adverse Form 1024 determination letters issued by the IRS National Office and the other filed petition resulted from one of the 12 audits described in Section B above. All three Tax Court cases were subsequently transferred to IRS Appeals for an administrative hearing. In 2014, after multiple conferences and subsequent re-reviews of the captives' work product by the Service extending for more than a year, IRS Appeals conceded all the issues in these three cases, with no taxes, interest or penalties due. As a result, the U.S. Tax Court entered decisions in favor of the three captives consistent with the decision of IRS Appeals.

Please note that the IRS agent in these three cases was the same one who audited the nine captives referenced in Section D. below. IRS Appeals declined to follow the IRS National Office's determination in the two cases in which the National Office had originally issued adverse rulings. That is, IRS Appeals disagreed with the IRS National Office, which was reflected in a decision by the U.S. Tax Court in favor of Capstone's clients.

D. Nine audits (exclusive of the one recent (June 2015) audit- see paragraph E below) remain, which are now in IRS Appeals. All nine audits, which were conducted by the same IRS agent referenced in Section C. above, are before IRS Appeals which is considering the taxpayer's request for reversal of the IRS agent's adverse exam reports. All cases are factually similar to the cases ruled upon by IRS Appeals referenced in Section C. above and in the 39 favorable Form 1024 tax exemption letters and the 12 completed audits. That is, a single IRS auditor issued adverse audit rulings on 12 captives, despite the prior decade plus-long Capstone/Firm experience to the contrary by other IRS auditors and without regard to the 39 favorable tax exempt rulings.

THE FELDMAN LAW FIRM LLP

TAX RISKS AND RESPONSIBILITIES UNDER IRC §831 (b)
Page 7

The IRS Appeals officer who ruled upon the concession leading to the U.S. Tax Court entry of judgment in the taxpayers' favor referenced in Section C. above is now the group manager over the team handling these matters in IRS Appeals. A decision is expected over the next six months. Should IRS Appeals not concede the cases, the cases will likely proceed to the U.S. Tax Court.

E. One audit of a captive that was initiated in June 2015 through an audit of a client's operating business. This matter is in its early stages.

F. An estimated four to six audits of clients' operating businesses which included some examination of insurance premiums. These audits resulted in "no change" to the insurance deduction. Our involvement in these audits varies.

G. In June 2015, the IRS notified either Stewart A. Feldman or the Firm or Capstone (the addressee of the inquiry is unclear) that the captive insurance/alternative risk planning program is the subject of a review by the IRS and issued an information document request (IDR). The Firm is unclear whether this IDR is unconnected with the audits of any particular captive client, but is likely connected to the IRS's examination of captive insurance programs generally. The Firm believes that the inquiring IRS agent was unaware of the dozens of completed IRS reviews of the planning resulting in its agreeing with the taxpayers' positions. After a three day review by the IRS agent and after providing him evidence of the more than 50 prior successful rulings by the IRS, this matter has been dormant.

The Firm has retained outside counsel or co-counsel to assist both (i) in response to the Service's IDR discussed in paragraph G above; and (ii) in connection with the nine pending audits now before IRS Appeals which are discussed in paragraph D above (the other 55+ matters described above having been successfully concluded).

The Firm does not believe that there is any conflict created by the inquiries in paragraph G above and the nine remaining audits of the captive insurance companies which are now in IRS Appeals. Similarly, the Firm does not believe that there is a conflict between the Service's IDR and the position of any one or more clients.

In accordance with the terms of the engagement letter, the Firm is handling the above matters. However, any client is welcome to evaluate the facts and conclude if it wishes to hire its own CPA or counsel to participate in or take over the work in these matters independently of the Firm and its co-counsel.

We are available to discuss or further explain these issues in more detail as needed to enable you to make an informed decision on these matters.

SEPTEMBER 29, 2015

## Exhibit D

### St. Charles Surgical Hospital and The Center for Restorative Surgery

#### Brief Comparison of Types of Captives

|  | Small Captive | Intermediate Size Captive |
|---|---|---|
| *Expected Maximum Practical Premium Per Year (Maximum Legal Premium Limit)* | ■ | $1,000,000.00 (up to a maximum of $1,200,000.00) in premiums. While investment income is generally unlimited, it receives no special tax treatment. Underwriting income is not taxed. |
| *Type of entity; year end* | ■ | C corporation. December 31st. |
| *Tax consequences from the standpoint of the captive insurer* | ■ | Underwriting income is tax exempt. Investment income is taxable like any other C corporation. |
| *Insurance activities* | ■ | During any given taxable year, more than half of the revenues for a captive must be the derived from insurance contracts or from reinsuring the risks of other insurance companies |

■ *Note: Because the St. Charles Surgical Hospital and The Center for Restorative Surgery family of companies include risks far exceeding the limited capabilities of one or more small captives, the small captive is inapplicable to your situation.*

## Exhibit E
### Third Party Insurance

Capstone encourages participation in two separate third-party reinsurance programs:

a. Pool Re - a risk pooling arrangement involving sets of generally similar policies covering generally similar risks of closely-held businesses, wherein each captive assumes reinsurance on policies covering other clients of Capstone; and

b. CreditRe - a reinsurance program wherein Capstone-sponsored captives assume reinsurance on contractual liability policies written to persons wholly unaffiliated with Capstone.

Clients may participate in either or both of these programs; however the final inclusion/exclusion decision is in the sole and absolute judgment of PoolRe, recognizing that PoolRe, which is owned by non-affiliates, is administered by Capstone which in turn from time-to-time draws upon the services of The Feldman Law Firm LLP. Typically pooled are 800± distinct policies on 400± distinct insureds. Only clients of both the Firm and Capstone that continue to be in good standing may participate in these reinsurance programs.

### PoolRe (Capstone-administered Risk Pool)

This risk pool is conducted by PoolRe Insurance Corp. ("PoolRe") which is domiciled in and licensed by the Financial Services Commission of Anguilla, British West Indies, a British overseas territory. PoolRe is an insurance and re-insurance company owned by an individual that is not affiliated with either the Firm or Capstone. PoolRe conducts the pooling program for a fee (that is, on a contract basis) paid by Capstone but is independently carried out by Pool Re. There should be no incremental operating cost to the pool participants; however, participants are responsible for insurance losses (claims).

This reinsurance facility is available to qualifying clients of Capstone subject to any captive participant or policy deemed inappropriate by PoolRe for any reason and thereby excluded (i.e., particular insurance policies and/or particular clients and/or policy pricing may be deemed unsuitable for or "non-homogeneous" with the risk pool). The risk pool conducted by PoolRe enables participating captive insurance companies to diversify their underwriting risks, furthering the insurance aspects (that is, the "law of large numbers") of the planning. Note that among the several hundred policies in the pool are policies issued to Capstone or the Firm (or their affiliates) and that their affiliated captives may participate in the pool.

Insurance involves the sharing of risk among insureds, which in turn furthers the predictability of losses through the law of a large numbers of covered risks. Through the pooling mechanism, participants "pool" their losses by accepting other participants' risks, which increases the diversification of each captive's underwriting by covering a larger number of risks. Thus, the basic concept behind the risk pool is for multiple insurers to share risks of multiple insureds. Limiting pool participants to Capstone-administered companies raises the confidence level as to the prudence of the risks being underwritten and as to the pricing of such. The result is a higher level of risk diversification for each of the individual client insurance companies.

Utilizing the risk pooling arrangement helps client captive insurance companies gain greater risk distribution. To achieve this, the pooling provides critical stop-loss protection for direct written policies, which is a type of catastrophic coverage. These catastrophic loss coverages are spread

among the participating captive insurers, which reduces the impact of losses on the individual captives. Furthermore, the reduction in loss variability (produced by the stop-loss coverage and by the sharing of risks through the pooling mechanism) is designed to stabilize cash expenditures for losses by the individual captive participants.

Client captives and their affiliated insureds are <u>not required</u> by Capstone to participate in the risk pool; Capstone and the Firm make this opportunity available to their joint clients but do not require their participation. It is ultimately the clients' sole decision (the clients being the captive insurer, its owners and officers, and the related insureds) as to whether or not to participate in the pooling arrangement. And, as mentioned above, once a client has decided to participate in the risk pool, it is within PoolRe's discretion as to which policies and insureds are included/excluded from the pool.

### CreditRe (Third Party Reinsurance, Retroceded through PoolRe Insurance Corp.)

Capstone's other third party reinsurance program enables Capstone-administered captives to more fully diversify their portfolio of risks underwritten, while enabling the captive to underwrite, in total (that is, including the PoolRe program above) either 30% or 50% of risks unaffiliated with the insureds or their beneficial owners. Captives at the 50% threshold of third party coverage may meet the IRS Safe Harbor risk distribution requirement for captive insurers. The 30% threshold is well established in tax law and in IRS rulings over the last twenty years but is not at the so-called safe harbor level.

The structure of this third party reinsurance program for 2014, which is expected to carry forward in some modified form for 2015, is as follows: Reinsurance for contractual liability coverage underwritten by Lyndon Property Insurance Company is assumed by Credit Reassuance Ltd. (CReLtd) from multiple cells of ARIA (SAC). These risks are then retroceded to PoolRe as part of a Reinsurance Contract which is updated and amended annually. PoolRe in turn retrocedes a portion of the risk exposure to participating captive insurers. There is no assurance that this program will continue into the future and the nature of this program has changed over the years.

The reinsurance agreement historically includes an experience refund formula, which provides for a refund to the ceding company if the experience is favorable. Based on the formula, each reinsurer can realize an underwriting profit of up to 10.25% of the earned premium with favorable experience. If loss experience is unfavorable, the reinsurer is subject to the possibility (albeit low) of unlimited losses. Even though the risk is not capped, the risk of catastrophic losses to the reinsurer is believed to be manageable based on historical data and loss projections, the diversification derived from the law of large numbers, and other policy provisions. Loss ratios for this program have ranged between 88% and 92% over the last seven years (2008 - 2014) which may or may not be indicative of future results.

*     *     *

The particulars of both insurance programs for any given year are described in the insurance contracts which are the definitive documents that control the respective insurance programs. The above provides only a summary as of the date and for the year set out below.

JANUARY 2015